(305 P.3d 716)
No. 106,813

STATE OF KANSAS, *Appellee*, v. MARTIN ALTHAUS, *Appellant*.

Opinion filed August 2, 2013.

*Christina M. Waugh*, of Kansas Appellate Defender Office, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., PIERRON, J., and LARSON, S.J.

ATCHESON, J.: Defendant Martin Althaus challenges his convictions for drug-related offenses in Reno County District Court on the sole ground that the search warrant for his home violated his constitutional right against unreasonable searches and seizures and the contraband law enforcement officers found there should have been excluded as evidence against him. The district court judge ruling on Althaus' motion to suppress held the Reno County Sheriff's deputy requesting the warrant failed to present probable cause to support the search but then acted in good faith when a different judge nonetheless signed the warrant, thereby rendering the search and seizure constitutionally unobjectionable and the evidence admissible. The district court erred in denying Althaus' motion to suppress. The application for the warrant was without any factual basis for the search of Althaus' home, a defect a reasonable law enforcement officer would have immediately recognized. The good-faith exception does not apply when an officer's reliance on a search warrant is objectively and entirely unreasonable. We, therefore, reverse the district court and remand with directions to vacate Althaus' convictions, to grant his motion to suppress, and to proceed with the case in a manner consistent with this opinion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 16, 2010, Reno County Sheriff's Deputy Rick Newton requested and received a search warrant for Althaus' Hutchinson home from District Court Judge Joseph L. McCarville, III. The warrant authorized officers to search the house for methamphetamine and other illegal drugs or related contraband and evidence of illegal trafficking, including paraphernalia for packaging and dis-

tribution of drugs and records of illicit transactions. Newton and other law enforcement officers executed the search warrant later that day. The officers seized a case for eyeglasses containing a small amount of methamphetamine, glass pipes commonly associated with the use of illegal drugs, and plastic sandwich bags in which traffickers often package those drugs.

After District Court Judge Trish Rose denied Althaus' motion to suppress—the controlling issue in this case to which we return shortly—Althaus was found guilty of possession of methamphetamine, a felony violation of K.S.A. 2010 Supp. 21-36a06, and possession of drug paraphernalia, a misdemeanor violation of K.S.A. 2010 Supp. 21-36a09, in a bench trial on stipulated facts. Judge Rose later placed Althaus on probation for 12 months with an underlying sentence of 15 months in prison on the methamphetamine offense and a concurrent sentence of 12 months in jail on the paraphernalia offense. Althaus has timely appealed those convictions, arguing the drugs and paraphernalia should have been suppressed as the product of an unlawful search of his home in violation of the Fourth Amendment to the United States Constitution. On appeal, he also challenges his sentence. But in light of our ruling reversing the convictions, the sentencing issue is moot, and we do not consider it further.

Deputy Newton presented a nine-page affidavit to Judge McCarville in support of the search warrant. The affidavit contains information about Althaus in a single paragraph covering about half a page. The paragraph, in full, states:

"On July 16, 2010, members of the D.E.U. observed two individuals who they know to be involved in the use and/or distribution of methamphetamine at Ms. Garcia's residence. One of the individuals is Marty Althaus, who upon leaving Ms. Garcia's residence drove directly to a storage facility at Hutch Storage, Unit 44B at 801 North Hendricks, Hutchinson, Kansas, where he stayed for approximately 1 minute. This storage unit is rented under the name of Robbin Garcia, [street numbers redacted from original] Westside Villa. During the last several months, the D.E.U. has observed Mr. Althaus frequenting a residence at [street numbers redacted from original] East B Avenue, Hutchinson, Reno County, Kansas, which is owned by Ms. Garcia and her husband. The D.E.U. has observed Mr. Althaus at this residence at times when Ms. Garcia was present and at other times when Ms. Garcia was not present. The D.E.U. knows Marty Althaus resides at [street

numbers redacted from original] Hayes Street, Hutchinson, Reno County, Kansas."

The only other paragraph in the affidavit mentioning Althaus is a general one in which Deputy Newton offers his opinion that the information demonstrates probable cause to conclude Althaus is involved in the distribution of illegal drugs and illegal drugs may be found in his home.

The balance of the affidavit offers information principally about Tammy Wise and to a lesser extent Robbin Garcia, who is mentioned in the paragraph about Althaus. The affidavit recounts surveillance of Wise's residence confirming many people arriving and leaving in especially short time periods—a circumstance Deputy Newton avers, based on his training and experience, to be indicative of drug trafficking. The affidavit states that individuals the investigators "know[] to be involved in the manufacturing of methamphetamine have been observed at [Wise's] residence." The affidavit relates other encounters or meetings between Wise and individuals "known" to be traders in illegal drugs. But the affidavit neither names those persons nor describes the factual basis of the investigators' knowledge.

According to the affidavit, Wise twice left her workplace during the evening of June 25, 2010. The first time she went to her house and then met briefly with someone else in another vehicle. She later left work and briefly stopped in an alley. The affidavit implies those comings and goings to be sinister.

The affidavit relates that for 3 consecutive weeks, Deputy Newton intercepted trash from Wise's residence after it had been set out for pickup. The first trash intercept or pull yielded "the torn corner" of a plastic sandwich bag, something Deputy Newton recognized to be a common medium for packaging illegal drugs for distribution. The last two pulls contained plastic bags and a syringe that tested positive for methamphetamine based on field tests the officers made. No results from laboratory tests were reported in the affidavit.

The affidavit describes Garcia to be "well known" to investigators "for her involvement in the distribution of methampheta-

mine." But the affidavit recites no factual basis for that notoriety. The investigators also had information of some sort from some source that Garcia supplies Wise with methamphetamine. On July 15, 2010, investigators saw Garcia meet at her home with a known drug distributor and leave about 45 minutes later to go to the residence of another person known to use and distribute methamphetamine. Again based on his training and experience, Deputy Newton avers in the affidavit that Garcia's actions were consistent with how drug traffickers operate: They commonly conceal and transport their illegal merchandise in their cars; and they will be resupplied with drugs from a distributor and, in turn, provide drugs to their customers. He also asserts drug dealers often store their merchandise and money in multiple locations to avoid detection.

According to the affidavit, a confidential informant of "questionable" reliability told Deputy Newton and other law enforcement officers that Garcia and Wise distribute methamphetamine.

Based on the affidavit, Judge McCarville issued the search warrant for Althaus' home. The record in this case does not indicate if Judge McCarville or any other judge issued additional search warrants based on the affidavit. The affidavit itself states it would support search warrants for Wise's home, Garcia's home, Althaus' home, and the storage unit Althaus visited.

Althaus filed a motion to suppress the evidence seized during the search of his home and challenged the affidavit and search warrant as lacking probable cause in violation of his Fourth Amendment rights. Judge Rose heard the motion on April 29, 2011, and issued an order on May 9, 2011. Judge Rose found the affidavit failed to establish probable cause for a search of Althaus' home. Citing *State v. Hoeck*, 284 Kan. 441, 163 P.3d 252 (2007), Judge Rose held that the good-faith exception to the exclusionary rule should apply because the warrant and affidavit had enough "indicia of probable cause" that a law enforcement officer's reliance on the legal sufficiency of the warrant—once a judge signed it—would not have been entirely unreasonable. Judge Rose, therefore, denied the motion to suppress.

Althaus timely appealed the denial of the motion, and that is what we have before us.[1]

[1] In the motion to suppress, Althaus also argued that law enforcement officers searched a motor vehicle of his in violation of the Fourth Amendment. As we understand the record, no evidence or contraband was found in the vehicle. On appeal, Althaus makes no argument about the search of the vehicle. So we deal only with the search of Althaus' residence and the evidence seized there.

## LEGAL ANALYSIS

### I. *Overview of Analysis.*

This case necessarily cuts deep into how courts go about balancing the fundamental right of citizens to be free from unreasonable governmental intrusion into their homes, as protected in the Fourth Amendment, with the needs of law enforcement agencies to effectively investigate criminal activity. The importance of the constitutional limitations on government agents entering citizens' homes cannot be overemphasized from a historical perspective. But in the past 40 years, the United States Supreme Court, as the final arbiter of Fourth Amendment jurisprudence, has curtailed the remedies for search and seizure violations. The Court has relaxed the exclusionary rule—prohibiting the government's use of unconstitutionally procured evidence against a criminal defendant—when law enforcement officers act in good faith based on a judicially issued search warrant. But the good-faith exception will not rescue a search when a reasonable law enforcement officer would recognize the warrant and the supporting affidavit to be patently insufficient. *Hoeck*, 284 Kan. 441, Syl. ¶ 2 ("good faith exception applies when an affidavit . . . provide[s] some indicia of probable cause sufficient to render official reliance reasonable").

Taking account of those principles and balancing the related interests, we conclude that Judge Rose erred in excusing the Fourth Amendment violation here as a product of Deputy Newton's good-faith reliance on the signed search warrant. A law enforcement officer making an objectively reasonable assessment of the affidavit and warrant would have recognized the absence of anything remotely resembling a factual basis for probable cause to search Althaus' home. The good-faith exception to the exclusionary rule, therefore, does not apply. In turn, Judge Rose should have deployed the exclusionary rule to remedy the unconstitutional search of Althaus' residence. The motion to suppress should have

been granted as to any contraband or other evidence law enforcement officers seized from the residence.

The propriety of applying the good-faith exception here amounts to a question of law. Whether the affidavit Deputy Newton submitted to Judge McCarville supporting the warrant presents factual information indicative of probable cause to search Althaus' residence, thereby triggering the good-faith exception, depends upon its content. The affidavit is in the record. And we can assess its legal import for Fourth Amendment purposes just as well as the district court. *Hoeck,* 284 Kan. at 447 (good-faith exception presents question of law subject to unlimited appellate review); *State v. Hicks,* 282 Kan. 599, 612-13, 147 P.3d 1076 (2006); *United States v. Tisdale,* 248 F.3d 964, 972 (10th Cir. 2001). We, therefore, exercise unlimited review without deference to Judge Rose's legal conclusion, although the standard governing application of the good-faith exception is itself particularly deferential to (or forgiving of) law enforcement officers acting pursuant to a search warrant.

II. *Fourth Amendment Principles.*

A. *Rights Protected.* By its express language, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures." To further that right, the Fourth Amendment also requires warrants based "upon probable cause" be presented under oath to a judicial officer and any warrant describe with particularity the places to be searched and the objects to be seized. See *Illinois v. McArthur,* 531 U.S. 326, 330, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001). The warrant requirement, thus, interposes an independent reviewing authority—a judge—to assess the sufficiency of the grounds government agents offer for interfering with citizens or their property.

This court recently outlined the roots of those Fourth Amendment protections in abuses the British Crown inflicted on the American colonists. *State v. Dugan,* 47 Kan. App. 2d 582, 587-88, 276 P.3d 819 (2012). The United States Supreme Court has often paused to expound on that history as informative of a proper interpretation of the Fourth Amendment. See *Payton v. New York,*

445 U.S. 573, 583-85 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) (noting antipathy toward both the use of writs of assistance in the Colonies and the use of general warrants in England as animating inclusion of the Fourth Amendment in the Bill of Rights); *Boyd v. United States*, 116 U.S. 616, 624-27, 6 S. Ct. 524, 29 L. Ed. 746 (1886). And, as that authority reflects, those constitutional protections against unreasonable government searches offer their most profound service at the threshold of a citizen's residence. *Florida v. Jardines*, 569 U.S. ____, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495 (2013) ("At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 [1961]); *Dugan*, 47 Kan. App. 2d at 588. Indeed, houses are the only places specifically mentioned in the Fourth Amendment.

Here, of course, Deputy Newton obtained a search warrant for Althaus' home. But that doesn't end the inquiry. To be constitutionally valid, a search warrant must be supported by probable cause. On appeal, the State does not dispute Judge Rose's finding that Deputy Newton's affidavit in support of the search warrant failed to do so. The warrant, therefore, has to be treated as constitutionally deficient. Consistent with our ultimate decision here, we share that much of Judge Rose's assessment. The lack of probable cause moves the inquiry to the good-faith exception, since evidence may nonetheless be admitted against a defendant if the officers executing a constitutionally inadequate warrant have relied in good faith on its apparent validity.

To arrive at our conclusion that Judge Rose erred in applying the good-faith exception, we look at the exclusionary rule to which the exception applies. We then outline the good-faith exception itself. Before analyzing the facts here in determining that the exception should not apply, we discuss probable cause—providing a baseline for measuring the lack of indicators of probable cause in Deputy Newton's affidavit.

B. *Exclusionary Rule and Good-Faith Exception.* When law enforcement officers conduct an unreasonable search, thereby violating the Fourth Amendment rights of an individual, the courts have commonly precluded the use of any resulting evidence in the prosecution of that individual as a remedy for the violation. *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.' "); *Mapp v. Ohio*, 367 U.S. 643, 654-55, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (In holding the exclusionary rule should apply to state and local government agents, the Court recognizes that without the rule the protections of the Fourth Amendment would be reduced to " 'a form of words,' valueless and undeserving of" a place in the Constitution.). The exclusionary rule dates back nearly a century. *Weeks v. United States*, 232 U.S. 383, 392-93, 34 S. Ct. 341, 58 L. Ed. 652 (1914) (ordering suppression of business records and other papers seized by a U.S. marshal without a warrant); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-92, 40 S. Ct. 182, 64 L. Ed. 319 (1920). And courts continue to view the exclusionary rule as the most effective way to deter unconstitutional searches on the theory that law enforcement officers will avoid those searches precisely because the government will be deprived of resulting inculpatory evidence in prosecuting accused criminals. In other words, law enforcement officers will strive to comply with the Fourth Amendment to avoid exclusion of otherwise damning evidence of criminal wrongdoing. *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (The exclusionary rule is " 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.' ") (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]); *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (The exclusionary rule's "purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.").

Historically, the Court also viewed the exclusionary rule as preserving the integrity of the judicial process by banishing evidence secured only because government agents violated the Constitution. *Elkins*, 364 U.S. at 222-23; *Weeks*, 232 U.S. at 394 ("To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action."). The twin objectives of deterring unconstitutional searches and preserving judicial integrity made the exclusionary rule an essential remedy for Fourth Amendment violations. See *Mapp*, 367 U.S. at 657; *Weeks*, 232 U.S. at 393; *cf. Leon*, 468 U.S. at 905-06 (recognizing that Court precedent has "implied that the exclusionary rule is a necessary corollary of the Fourth Amendment").

Despite its undeniably laudable purpose, the exclusionary rule can exact a heavy price in the loss of evidence in a given case and may effectively preclude the successful prosecution of a guilty defendant. After *Mapp* mandated the exclusionary rule as a remedy for Fourth Amendment violations by state and local law enforcement officers, the Court's strict adherence to it began to ebb. *Calandra*, 414 U.S. at 348. The Court has come to identify deterrence of police misconduct as the functional purpose for the rule, discarding preservation of judicial integrity as a consideration. *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 916 ("the exclusionary rule is designed to deter police misconduct"); 468 U.S. at 933-35 (Brennan, J., dissenting) (condemning majority's analysis as disabling Fourth Amendment protections); *Calandra*, 414 U.S. at 348; 414 U.S. at 360-61 (Brennan, J., dissenting) (deploring abandonment of judicial integrity as Fourth Amendment consideration). In doing so, the Court unyoked violations of the Fourth Amendment from the exclusionary rule as a remedy. Whether a court should enforce the exclusionary rule in a given case presents a question separate from the defendant's demonstration that his or her Fourth Amendment rights have been violated. *Leon*, 468 U.S. at 906. In short, the Court has determined the exclusionary rule is not constitutionally mandated. *Calandra*, 414 U.S. at 348 ("[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights

generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."); see *Herring*, 555 U.S. at 141. The Court has turned to cost-benefit analysis alone in determining when to exclude evidence seized in violation of the Fourth Amendment—does the cost in retarding a given criminal prosecution by excluding evidence justify the resulting benefit in deterring Fourth Amendment violations? See *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. at 922.

In *Leon*, a divided United States Supreme Court recalibrated that balancing of interests when law enforcement officers obtain judicially approved search warrants later adjudged to be constitutionally deficient. 468 U.S. at 907-09. The Court held that evidence should not be suppressed if the law enforcement officers relied in good faith on a signed warrant in conducting a search. 468 U.S. at 913. Thus, the "good faith exception" to the exclusionary rule became part of Fourth Amendment jurisprudence. The Kansas Supreme Court has fully embraced the good-faith exception as delineated in *Leon*. *Hoeck*, 284 Kan. 441, Syl. ¶¶ 1, 2, 463; see *State v. Daniel*, 291 Kan. 490, 492, 242 P.3d 1186 (2010).

The *Leon* majority concluded that a good-faith exception would encourage law enforcement officers to obtain judicially approved warrants rather than engaging in warrantless searches by affording them greater protection for doing so—thereby fostering the strong Fourth Amendment preference for warrants. *Leon*, 468 U.S. at 913-14, 920-21; see *Hicks*, 282 Kan. at 613 (noting that deferential judicial review of warrants and searches based on them incentivizes decision of law enforcement officers to seek warrants). And the Court reasoned that the exclusionary rule serves no useful end when a judge erroneously issues a warrant because nothing suggests judicial officials purposefully aim to subvert constitutional rights. That is, judges do not need a mechanism to deter them from violating the Fourth Amendment, since they do not set about acting in ways that do. 468 U.S. at 916-17.

The United States Supreme Court, however, stopped short of creating a blanket exception to the exclusionary rule when a law enforcement officer acts on a judicially issued search warrant. The *Leon* Court recognized four circumstances in which the good-faith

exception would not apply: (1) the judicial officer issuing the warrant has been misled by information the author of the affidavit knew or should have known to be false; (2) the judicial officer has "wholly abandoned" the role of a detached and neutral official and has merely rubberstamped the request for a warrant; (3) the affidavit is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' "; or (4) the warrant itself is patently deficient, for example, in describing with particularity the place to be searched or the items to be seized. 468 U.S. at 923. As contemplated in *Leon*, those circumstances represent narrow and factually rare instances negating the good-faith exception.

Application of the good-faith exception presumes a "well trained" law enforcement officer "hav[ing] a reasonable knowledge of what the law prohibits." 468 U.S. at 919 n.20, 923; see *United States v. Gonzales*, 399 F.3d 1225, 1230 (10th Cir. 2005). A law enforcement officer, therefore, should be conversant in the broad precepts implicated in a Fourth Amendment search and, likewise, should recognize an obviously deficient warrant. *United States v. Roach*, 582 F.3d 1192, 1204 (10th Cir. 2009). And good faith is measured by how a "reasonable" law enforcement officer would view the circumstances. So an officer poorly versed on basic search and seizure requirements may not rely on the good-faith exception solely because he or she subjectively believes the judge acted properly in signing a warrant. *Leon*, 468 U.S. at 919-20 & n.20.[2]

[2]The good-faith exception has a fair share of critics in addition to the dissenters in *Leon*. Appellate courts in a number of states have specifically rejected a comparable exception to the exclusionary rule in construing protections in their respective state constitutions corresponding to the Fourth Amendment. See, *e.g.*, *State v. Cline*, 617 N.W.2d 277, 278, 292-93 (Iowa 2000), *overruled on other grounds State v. Turner*, 630 N.W. 2d 601, 606 (Iowa 2001); *State v. Novembrino*, 105 N.J. 95, 157-58, 519 A.2d 820 (1987); *State v. Gutierrez*, 116 N.M. 431, 432, 863 P.2d 1052 (1993); *State v. Crawley*, 61 Wash. App. 29, 35, 808 P.2d 773 (1991). Kansas is not among them. *Daniel*, 291 Kan. at 498-500 (holding § 15 of the Kansas Constitution Bill of Rights affords rights identical to the Fourth Amendment and, therefore, the *Leon* good-faith exception should be woven into state constitutional protections against unreasonable searches and seizures). In this case, Althaus neither explicitly relied on the Kansas Constitution nor argued

for broader protections under § 15, an approach that would have been incompatible with *Daniel.*

In this case, the only basis on which the good-faith exception could be inapplicable is the lack of indicia of probable cause in Deputy Newton's affidavit supporting the warrant request. Judge Rose explicitly considered only that exception. Nobody has suggested the affidavit contains false information or that Judge McCarville failed to exercise the duties of a detached judicial officer in approving the warrant. The warrant appears to be proper; it is signed and dated and identifies with specificity the place to be searched and the items sought.

C. *Probable Cause.* To assess whether a reasonable, well-trained law enforcement officer could rely in good faith on the indicia of probable cause in an affidavit, a court necessarily must view that content in light of the legal standards for establishing probable cause. Probable cause in the context of a search warrant request requires that government agents know specific facts leading a reasonable person to conclude evidence of a crime may be found in a particular place. *Ornelas v. United States,* 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) ("[P]robable cause to search . . . exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."); *Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (search warrant may issue when the supporting affidavit establishes "a fair probability that contraband or evidence of a crime will be found in a particular place"); *Hicks,* 282 Kan. at 611; *State v. Probst,* 247 Kan. 196, 200, 795 P.2d 393 (1990); *State v. Bottom,* 40 Kan. App. 2d 155, 161, 190 P.3d 283 (2008), *rev. denied* 287 Kan. 766 (2009). Those facts must then be stated under oath to a judge to obtain a search warrant.

Here, Deputy Newton's affidavit was the sole vehicle for conveying the factual basis of the warrant to Judge McCarville. A judge may issue a search warrant in reliance on an affidavit, sworn testimony, or a combination of the two. See K.S.A. 2010 Supp. 22-2502(a) (procedure for issuing search warrant based on oral or

written statements given under oath). Nothing in the record suggests Judge McCarville supplemented Deputy Newton's affidavit in any way.

Because a search warrant requires an evidentiary foundation, law enforcement officers may not rely on conclusory assertions or opinions unmoored from specific factual representations. *Ornelas*, 517 U.S. at 696; *Gates*, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and . . . wholly conclusory statement[s] . . . fail[] to meet this requirement."); *Probst*, 247 Kan. at 202. The facts need not be in a form admissible at trial—hearsay and other secondhand information may suffice, if the overall circumstances demonstrate reliability. *Hicks*, 282 Kan. at 614; *Probst*, 247 Kan. 196, Syl. ¶ 3. But judicial officers cannot provide the independent check contemplated in the Fourth Amendment if they are asked to review conclusions rather than facts. As the *Gates* Court stated: "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." 462 U.S. at 239. The United States Court of Appeals for the Tenth Circuit recently reiterated the rule simply and clearly: "[A] magistrate's probable cause determination must be supported by facts presented in the affidavit[.]" *Roach*, 582 F.3d at 1200. The Kansas Supreme Court has been equally direct in holding that "[b]ald conclusions, mere affirmations of belief, or suspicions are not sufficient to support a finding of probable cause." *Hicks*, 282 Kan. at 614. The court recognized that a judge should not consider allegations lacking factual support in measuring probable cause to issue a search warrant. 282 Kan. at 615-16. The concept is hardly a novel one. *Roach*, 582 F.3d at 1203 ("It has long been established that a warrant must be supported by *facts* demonstrating probable cause, not by police summaries of what they have concluded from such facts.").

III. *Assessing the Probable Cause Affidavit.*

We now turn to evaluating Deputy Newton's affidavit for indicia of probable cause to support a search warrant for Althaus' home.

For clarity's sake, we reiterate that the question is not whether the affidavit furnished probable cause for the warrant or whether the issuing judge might have fairly concluded that it did. The issue is more deferential still: Would a reasonable law enforcement officer have recognized the affidavit to be so lacking in indicators of probable cause that he or she could not have held a good-faith belief in the validity of the warrant, notwithstanding the issuing judge's decision to sign it? See *Hoeck*, 284 Kan. at 465 (good-faith exception inapplicable when affidavit contains "so little indicia of probable cause" that it would be "entirely unreasonable for the officers to believe the warrant was valid").

The relevant indicators, however, pertain only to Althaus' house. That an officer reasonably might in good faith conclude the affidavit supported and the warrant permitted a search of some other place is legally beside the point. To hold otherwise would allow that law enforcement officer to rely on what amounts to a constitutionally prohibited general warrant authorizing searches without a demonstration of probable cause as to the particular place to be searched. The notion of a general warrant is so antithetical to the elemental and elementary principles of the Fourth Amendment that a reasonably trained law enforcement officer would understand that an affidavit must contain facts indicating contraband or evidence may be found in the place to be searched.

At the outset, we look at Deputy Newton's repeated reliance in the affidavit on his colleagues' purported knowledge that various persons use or trade in methamphetamine. A reasonable law enforcement officer ought to understand a representation that an individual named in an affidavit is "known" to be involved in drug trafficking (or some other nefarious endeavor) amounts to the sort of opinion that cannot lend any weight to a probable cause determination. Standing alone, it is a conclusion without factual support. A judge considering a warrant application cannot independently assess the factual strength of that sort of generalized claim.

Officers' "knowledge" could be derived from any number of sources—community rumor; representations of informants with varying degrees of reliability reporting firsthand, secondhand, or remote reconnaissance; or controlled buys of illicit drugs from the

individuals themselves. The knowledge might be of recent origin or comparatively ancient history. Some of those circumstances might be quite reliable, such as recent controlled buys, and some next to worthless as nothing more than the word on the street. Here, the affidavit contains no explanation of the purported knowledge. So those representations amount to probable cause nullities. Their lack of value is not a matter of sophisticated Fourth Amendment law but of the well-settled and easily understood idea that facts are the building blocks of probable cause. *Cf. Hicks*, 282 Kan. at 615-16 (discounting reports from unnamed citizen informants when the basis of their knowledge has not been disclosed in affidavit). The reasonable officer would understand those statements in the affidavit are not indicia of probable cause. That eliminates the only "direct" reference in the affidavit to Althaus possessing or trafficking in illegal drugs. And it similarly clips the information about Garcia.

The affidavit also refers to a confidential informant of questionable reliability providing "information" that Wise and Garcia traffic in methamphetamine. But the basis of the informant's understanding is not specified. Did the informant hear that from others? Did he or she buy from or sell to either or both of them? And the affidavit does not divulge anything about the informant's limited credibility. Is he or she mentally ill? Has he or she cut a deal with law enforcement agents in exchange for the tip? Has he or she given them demonstrably false information in the past? The informant doesn't count for much as an indicator of probable cause for the web spun in the affidavit purportedly extending to Althaus' home.

Without going over all that we have already described in the affidavit, it presents indicia and more that Wise was trafficking in methamphetamine. But nothing in the affidavit connects Althaus directly to Wise. Each of them, in different ways, links to Garcia. Apart from the informant's statement, the affidavit places Garcia's car in front of Wise's home once, apparently in May 2010, and has Wise visiting Garcia's home once on July 14, 2010. On July 14, Wise also met with several people at her own residence under circumstances Deputy Newton represents, based on his training

and experience, to indicate drug trafficking. The affidavit states law enforcement officers have "information that Ms. Garcia supplies Ms. Wise with methamphetamine." But the affidavit fails to divulge or describe the source of or the factual basis for that information. The statement, therefore, fails to add anything to the probable cause mix for the same reason the unsupported references to the officers' "knowledge" fail. According to the affidavit, Garcia had two people at her house, one of whom stayed a short time (suggesting to Deputy Newton a drug deal) and the other of whom the questionable informant described as a methamphetamine trafficker. As to the second visitor, the affidavit is at best elliptical, since it actually refers to that individual's car being at Garcia's home—the implication being the owner of the car was, in fact, the visitor. That same day, Garcia visited the home of an individual convicted of a felony drug offense about 10 months before.

Given the exceptionally relaxed review for the good-faith exception, we suppose the affidavit has indicia of probable cause that Garcia was trafficking and could have had illegal drugs at her home. The factual basis is thin. But we make the assumption that a reasonable officer could rely on a search warrant for Garcia's home. And the affidavit shows some connection between Wise and Garcia.

The link between Garcia and Althaus is confined to the paragraph in the affidavit about him we have quoted. A law enforcement officer saw Althaus at Garcia's home. From there, he went to a storage unit that Garcia owned and remained there for 1 minute, according to the affidavit. There is no information about what Althaus appeared to do at the storage unit or where he went from there. The remaining information describes Althaus as "frequenting" another house Garcia owns in the "several months" before the affidavit was prepared. Garcia apparently was at that house some of the times Althaus visited and other times not. The affidavit merely conveys that Althaus was there from time to time; it doesn't say exactly when, how often, or what he appeared to be doing. See *Hicks*, 282 Kan. at 616 (a "handful of visits" discounted as failing to support inference of drug trafficking). The affidavit reports no suspicious activity indicative of drug trafficking at Garcia's second

house. Deputy Newton reported no pattern of short visits indicating Garcia was dealing drugs there or that Garcia stopped there before going to what appeared to be drug deals elsewhere. Apart from Althaus' visits there, the house is not mentioned in the nine-page affidavit.

Finally, of course, the affidavit recites the address of Althaus' home. The affidavit reports no goings on at his house or visitors there. Law enforcement officers saw nothing obviously sinister at the house or even implicitly so based on their training and experience. They didn't inspect Althaus' trash or otherwise develop information about the house. Just how a reasonable law enforcement officer would discern any indicia in the affidavit that drugs, other contraband, or evidence of illicit activity might be found in Althaus' home is mysterious.

Strictly speaking, the affidavit and the warrant likely fail because Deputy Newton presented no facts showing how the law enforcement officers "know" Althaus resides at the Hays Street address. As to Wise, in contrast, the affidavit pointed to correspondence retrieved in the trash pulls and independent information obtained from a utility company connecting her to a house on East 9th Avenue. The only basis advanced in the affidavit for believing drugs or contraband might be found at the house on Hays Street was that Althaus lived there. But the affidavit includes no facts bearing on his residency there—only the generic conclusion. We do not decide the appeal on the absence of facts tying Althaus to the Hays Street property identified in the search warrant, although we likely could. See *Gonzales*, 399 F.3d at 1231 ("For good faith to exist, there must be *some* factual basis connecting the place to be searched to the defendant or suspected criminal activity."); *United States v. Hove*, 848 F.2d 137, 139-40 (9th Cir. 1988).

Based on the affidavit, Althaus had what seems to be, at best, some limited and benign (or at least inscrutable) contact with Garcia over the course of a couple of months. Garcia, in turn, had greater and arguably more suspicious contact with Wise, about whom law enforcement officers had generated a fair amount of information to suggest her involvement in drug dealing. The factually supported averments of the affidavit suggesting Althaus used

or trafficked in illegal drugs rest on nothing more than his associating in limited and innocuous ways with an associate (Garcia) of a possible drug dealer (Wise). That adds up to nothing of legal substance implicating Althaus in illicit drug activity. It is sort of guilt by association once removed, and that is too distant a relationship. But credulity must be further strained to then take the next and crucial step to conclude such a void somehow generates objective indicia that illegal drugs or evidence of drug trafficking might be found in Althaus' home. See *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *State v. Haffner*, 42 Kan. App. 2d 205, 212, 209 P.3d 734 (2009) (warrant to search a person's home must establish "some nexus between the alleged criminal activity and the place to be searched").

The facts recited in the affidavit do not in any legally acceptable way invigorate the officers' otherwise undefined representations of knowledge about the involvement of Althaus in drug activity. In other words, they cannot be said to verify that knowledge. The specifically described activities of Althaus might cast a suspicious shadow only if they were viewed as the activities of a known drug trafficker. (Even then, the shadow would be faint.) But the officers' "knowledge" of Althaus' purported trafficking has *no* factual basis in the affidavit, so it cannot be used to impute meaning to Althaus' facially innocuous conduct. And, in turn, that conduct cannot supply a factual basis supporting the empty assertion of knowledge. Such circularity of reasoning would convert a set of facts lacking suspicious character into indicia of probable cause based on a sinister premise that itself has no other factual basis.

Nor can the affidavit be salvaged through Deputy Newton's assertion that drug dealers often divide their merchandise, money, and "other items" among various locations to keep law enforcement officers from confiscating all of their business assets. That representation does nothing to demonstrate Althaus' limited contact with Garcia made him a drug trafficker, let alone that he keeps

methamphetamine or other contraband in his home. And it could be read to say dealers generally secure their product and their money at stash houses rather than their residences—actually undercutting the notion that illegal drugs might be found at Althaus' home. See *United States v. Chacon-Rios*, 220 Fed. Appx. 782, 783 n.1 (10th Cir. 2007) (describing a stash house as a place where a drug trafficker keeps drugs and money to disguise their ownership and to protect them from competitors and government agents); compare *United States v. Garcia*, 707 F.3d 1190, 1195 (10th Cir. 2013) (officer avers in affidavit for search warrant that based on his law enforcement experience, drug dealers normally maintain supplies of drugs in their residences, along with other evidence of trafficking).

In sum, no law enforcement officer conversant in basic search and seizure requirements could entertain an objective, good-faith conclusion that the affidavit presented even the faintest glimmer of probable cause to search Althaus' residence. See *Gonzales*, 399 F.3d at 1230 ("[W]hen the underlying documents [submitted to obtain a search warrant] are 'devoid of factual support,' an officer cannot be said to have relied on them in good faith."). Until Fourth Amendment jurisprudence recognizes spontaneous generation of probable cause for search warrants, reasonable law enforcement officers could not act in good faith on a warrant issued on a request bereft of facts tying a home to criminal activity.[3]

[3]That Judge McCarville signed the search warrant triggers the good faith analysis but does not decide it. If the law were otherwise, no search conducted under the auspices of a judicially issued warrant could ever be successfully challenged. We note the explanation for a patently deficient search warrant the court suggested in *Probst*:

"It is quite possible that the magistrate, in the press of other duties, did not take sufficient time to actually study the lengthy affidavit aimed primarily at Cross, and failed to winnow out the meager allegations relating to the defendant Probst. An initial reading of the affidavit with its myriad of allegations about the extensive methamphetamine trafficking of Cross could well have misled the magistrate. It may be that the magistrate, having found the allegations sufficient as to Cross, merely assumed the affidavit stated probable cause as to defendant Probst." 247 Kan. at 206.

As the affiant, Deputy Newton doesn't get a similar pass. He can't claim a failure to carefully review the affidavit or a mistaken assumption about its content to excuse a Fourth Amendment violation, since he prepared the document and swore to its accuracy.

When an application for a search warrant is fundamentally deficient in establishing probable cause, as is true here, the exclusionary rule fulfills its recognized deterrent purpose. The rule then "serves to deter" police conduct that is either intentional or results from "recurring or systemic negligence" and compromises Fourth Amendment rights. *Herring*, 555 U.S. at 144. In such a case, a reasonably trained law enforcement officer would recognize the abject failure of the affidavit to factually support the requested search warrant. And an officer obtaining and executing that warrant necessarily would be either ill-trained or acting in disregard of his or her training. The deterrent effect of the exclusionary rule, therefore, ought to yield beneficial results. The law enforcement agency presumably would take steps to better train its officers in basic search and seizure requirements, correcting systemic shortcomings. Or, if that training were already sufficient, the officer's supervisors would reemphasize that he or she needs to adhere to what has been taught, heading off any similar failure with future affidavits and warrants.

## CONCLUSION

The Fourth Amendment protects against unreasonable government searches, particularly of a citizen's home. When a judge signs a search warrant unsupported by facts indicating contraband or evidence may be found in that citizen's home, the resulting search is constitutionally unreasonable. A well-trained law enforcement officer necessarily must recognize that a warrant issued without factual support violates the Fourth Amendment, and the State, therefore, may not rely on the good-faith exception to the exclusionary rule to use any materials seized as evidence in the criminal prosecution of that citizen. This is such a case.

We reverse the district court's determination that the good-faith exception applies. On remand, the district court should vacate Althaus' convictions, grant his motion to suppress anything law en-

forcement officers seized from his house, and otherwise proceed in conformity with this opinion.