NOT DESIGNATED FOR PUBLICATION

No. 117,673

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMBER DAWN BARNES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed July 6, 2018. Reversed and remanded with directions.

*Sarah C. Anderson*, legal intern, and *Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Daniel D. Gilligan*, senior assistant district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON and BRUNS, JJ.

ATCHESON, J.: If government agents want to search a person's home, the Fourth Amendment to the United States Constitution requires them to present facts to a judge establishing probable cause for a warrant. Those facts must be sufficiently concrete and detailed to allow the judge to make an independent evaluation of the propriety of the request. Conclusions and generalities are not facts, and government agents should know the difference. Where, as here, law enforcement officers rely on a warrant resting on conclusions and generalities, they cannot lay claim to the good-faith exception to the

1

exclusionary rule to rescue an unconstitutional search of a home. We, therefore, reverse the contrary ruling of the Reno County District Court and remand with directions that the district court suppress the drugs and other contraband law enforcement officers seized in violation of Amber Dawn Barnes' Fourth Amendment rights.

This case now appears before this court for the second time. A panel of this court reversed a district court decision finding the affidavit to be sufficient to support the search warrant but remanded for consideration of the good-faith exception. *State v. Barnes*, No. 114,125, 2016 WL 7031847, at *5 (Kan. App. 2016) (unpublished opinion) (*Barnes I*). On remand, the district court received briefs and heard argument from lawyers for the State and Barnes and ruled the good-faith exception to the exclusionary rule applied, thereby permitting the use of the methamphetamine and drug paraphernalia seized from Barnes' home as evidence against her in this case. Barnes has appealed that ruling.

We address a narrow issue: Was the affidavit submitted to obtain the warrant to search Barnes' residence so lacking in facts that a reasonable law enforcement officer would have obviously recognized the absence of probable cause even though a judge signed the warrant? See *United States v. Leon*, 468 U.S. 897, 923, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *State v. Hoeck*, 284 Kan. 441, 464-65, 163 P.3d 252 (2007); *State v. Althaus*, 49 Kan. App. 2d 210, 225, 305 P.3d 716 (2013). This is a question of law. The assertions in the affidavit are themselves fixed—what the affiant stated within the four-corners of the document is undisputed. We measure the constitutional sufficiency of those assertions based on how the hypothetical reasonably well-trained law enforcement officer would view them. *Leon*, 468 U.S. at 919-20 & n.20; *Althaus*, 49 Kan. App. 2d at 222. The subjective beliefs of the law enforcement officers signing the affidavit or executing the search warrant are irrelevant. Because the issue turns on the application of legal principles to undisputed circumstances, we owe no deference to the district court. *Althaus*, 49 Kan. App. 2d at 217, 222.

We outline briefly the governing legal principles and then apply them to the content of the affidavit Hutchinson Police Officer Darrin Pickering submitted in support of a search warrant for Barnes' home in that city. An affidavit must establish probable cause—a reasonable belief—that contraband or evidence of a crime may be found at a specifically identified place. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State v. Hicks*, 282 Kan. 599, 611, 147 P.3d 1076 (2006). The facts recited in an affidavit must be sufficiently detailed so that the reviewing judge can independently assess whether they demonstrate probable cause. Conclusory assertions do not qualify as facts. *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."); *Hicks*, 282 Kan. at 614 ("Bald conclusions, mere affirmations of belief, or suspicions are not sufficient to support a finding of probable cause.").

Here, the affidavit fell short of showing probable cause to believe drugs, other contraband, or evidence of criminal activity would be found in Barnes' home. The panel so held in *Barnes I*, 2016 WL 7031847, at *4-5, and that holding is now law of the case. We share that conclusion, an unsurprising result both legally, given the content of the affidavit, and practically, since two members of the *Barnes I* panel reappear on this panel.

When government agents violate an individual's Fourth Amendment rights, any evidence they uncover typically may not be used against that person in a criminal prosecution. *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); *Leon*, 468 U.S. at 908-09. Courts, however, commonly do not invoke the exclusionary rule if the government agents have acted in good-faith reliance on a search warrant that a judge has reviewed and signed. *Leon*, 468 U.S. at 913-14; *Hoeck*, 284 Kan. 441, Syl. ¶¶ 1, 2 (recognizing good-faith exception as applied to search warrants). But the

3

good-faith exception itself does not apply in several narrow situations, including when the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 468 U.S. at 923; see *Althaus*, 49 Kan. App. 2d at 221-22. We recognize courts should rarely override the good-faith exception, thereby encouraging law enforcement officers to obtain search warrants. But that encouragement must be tempered with the court's obligation to deter patently unconstitutional searches and seizures, particularly those intruding upon a person's home, despite a judge's obviously mistaken decision to sign a warrant. See *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) ("At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 [1961]); *Herring*, 555 U.S. at 141 (deterrent function of exclusionary rule).

This case essentially replicates the legal issue posed in *Althaus*, although the content of the affidavit for the search warrant here presents a closer call on whether the good-faith exception should be overridden. In *Althaus*, the court offered a considerably deeper discussion of the Fourth Amendment principles at play. This court has also outlined the historical development of the Fourth Amendment, particularly as a shield against unreasonable government intrusion into an individual's home, in *State v. Dugan*, 47 Kan. App. 2d 582, 587-89, 276 P.3d 819 (2012). Those opinions amplify the Fourth Amendment law we apply today.

In the affidavit, Officer Pickering tried to show that illegal drugs or evidence of drug trafficking reasonably might be found in Barnes' home. He offered averments intended to establish that Arthur Adams was a drug dealer and that Adams and Barnes had a close association. He also included averments related to Barnes or her home. But the assertions lack sufficient specificity or relevance to support probable cause to believe contraband or other evidence might be found in Barnes' home when Officer Pickering

4

presented the affidavit to the district court in late October 2013 to obtain a search warrant.

The affidavit shows that a year earlier, law enforcement officers apprehended Adams with marijuana, and he was charged with possession with intent to distribute, among other offenses. Those charges remained unresolved when Pickering submitted the affidavit to the district court. The affidavit asserts that in October 2013, officers assigned to the Reno County Drug Enforcement Unit "received information from four reliable confidential informants" that Adams was then selling marijuana, methamphetamine, and prescription pills. The affidavit recites that the four informants had provided reliable information to law enforcement officers in successful drug prosecutions.

We suppose these informants were known to members of the drug unit, including Pickering, and they were not named in the affidavit to avoid compromising their identities. Government agents may rely on confidential informants and even unknown tipsters if the reconnaissance they provide can be verified as reliable. Commonly, verification rests on corroboration of details of the particular information, suggesting all of it may reliable, or on the source's history of providing reliable information. The affidavit likely establishes the reliability of the confidential informants.

The problem here is with their "information." The affidavit neither outlines nor describes the information, and the label alone is too generic to permit meaningful judicial review. The information could be based on the informants' witnessing or even participating in drug deals with Adams. That would be highly probative. But the information could just as easily be hearsay three or four layers deep—something approaching community rumor or word on the street. That would have little, if any, probative value. We made precisely this point about the unexplained use of the word "information" in a search warrant affidavit in *Althaus*, 49 Kan. App. 2d at 226.

5

Pickering's affidavit states that in the preceding several weeks—mid-to-late October 2013—drug unit officers had observed Adams drive to various residences, pick up an individual, drive around the block, and drop off the person back in front of the residence. Based on his training and experience, Pickering averred that sort of short contact suggested the delivery of illicit drugs to a customer.

The affidavit also states that "some" residences Adams "frequents are known to the [drug unit] for their involvement in controlled substances." The affidavit conspicuously does *not* assert that those residences are ones where the officers saw the apparent drug transactions. Nor does the affidavit describe the manner in which Adams "frequents" those places. The affidavit identifies by name three people who lived in the residences. Law enforcement officers saw one of the individuals purchase illegal drugs from unidentified individuals, presumably other than Adams, at unspecified times. Confronted about one of the transactions, the person admitted buying methamphetamine. The other two people have drug convictions. And one of them had an active criminal case for drug possession. We question whether the residence of a person with recent drug convictions or even pending drug charges can be fairly described for that reason as presently "involved in controlled substances" in a way that would support issuing a search warrant.

The affidavit, however, likely contains facts—mostly the apparent sales during the preceding several weeks—that would prompt a reasonable person to believe Adams was illegally trafficking in drugs. The affidavit then links Adams to a specific street address in Hutchinson where Barnes lives. According to the affidavit, drug unit officers have seen Adams go to Barnes' home as frequently as several times a day, "often spend[ing] several hours there." Adams had then been observed "engaging in what appear[] to be drug transactions at other locations." The affidavit, however, fails to say when any of these events took place. Nor does it quantify in any way how many days Adams had been seen at Barnes' residence. For all the affidavit shows, it could have been two or three times

6

months earlier. The affidavit also fails to identify the "other locations" Adams went to from Barnes' home or why his activity there looked to be drug trafficking. Again, the affidavit conspicuously refrains from saying those locations were the places the drug unit officers saw Adams in October 2013 or even the residences known for "their [drug] involvement."

A court cannot infer unstated facts to supplement what's actually in an affidavit. See *Virgin Islands v. John*, 654 F.3d 412, 419-20 (3d Cir. 2011); *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008); *State v. Malone*, 50 Kan. App. 2d 167, 172, 323 P.3d 188 (2014) (sufficiency of affidavit for search warrant determined from "the four corners of the document"). So a reviewing court could not assume those events tying Adams to Barnes' home happened shortly before Pickering drafted the affidavit.

The affidavit then recites the drug unit had been informed of a "Crime stoppers tip" that Barnes "is traveling to Wichita, Kansas, to purchase drugs, and is possibly selling methamphetamine" from her home. The affidavit, however, is silent as to when the tip was received or the substantive basis of the tipster's conclusions about Barnes. The tip could have been months old, and the district court had no reason to assume otherwise. See *Hicks*, 282 Kan. at 616 (stale or outdated information insufficient to show probable cause for search warrant). The source apparently was truly anonymous to the drug unit. None of the officers knew the tipster's name. And they had no apparent history with the source providing accurate information about other crimes. Nothing in the affidavit suggests the tipster had firsthand knowledge about Barnes' activities rather than simply speculation or rumor. See *State v. Slater*, 267 Kan. 694, 699-703, 986 P.2d 1038 (1999) (discussing indicia of reliability of citizen informants and tipsters). The tip might have had value as an investigative lead, but it conveyed nothing supporting a reasoned belief illegal drugs might be found in Barnes' home when the district court reviewed the affidavit in conjunction with the requested search warrant.

In the affidavit, Pickering offered that his training and experience allowed him to conclude that the combination of the crime stoppers tip and Adams' ill-defined visits to Barnes' house gave the appearance that Barnes was supplying Adams with drugs to sell. But Pickering doesn't explain what aspect of his background led him to believe the lengthy visits between Barnes and Adams were indicative of drug trafficking, while the brief motor-vehicle contacts Adams had with other individuals were similarly sinister. The ostensible conclusion seems to be that some contact, whatever its duration, with a suspected drug dealer, such as Adams, turns the other party into a fellow trafficker. But the result rests on unexplained reasoning drawn from otherwise mysterious training or experience. A district court cannot objectively assess the legal soundness of such conclusions and must be wary of generically invoked "training and experience" to justify an assertion that appears to be in tension with other assertions based on that same training and experience.

Finally, the affidavit describes a trash pull Pickering supervised at Barnes' residence the day he prepared and signed the affidavit. Pickering contacted the company that picks up the trash and arranged to have the bin of the truck cleared before it stopped at Barnes' house. Pickering saw that a trash container had been placed in front of the house and watched as the contents were emptied into the truck. He then examined the trash immediately after the truck drove away. So he would have been looking at only what had been in Barnes' container. Pickering found a broken glass pipe with burnt residue that was not otherwise identified, used ziplock plastic bags— one of which field tested positive for methamphetamine, plastic sandwich bags with the corners torn off, and used syringes. All of those items fairly could be considered drug paraphernalia, and the torn baggies would be consistent with packaging certain illicit drugs, including methamphetamine, for sale. Pickering also found mail addressed to Barnes and a handwritten note containing the name "Arthur."

From what the affidavit described, the trash was loose rather than in a garbage bag. Pickering provided no information about when the trash container had been placed in front of Barnes' house, who placed it there, or where the container was otherwise kept.

To support a search warrant, information gleaned from a trash pull must provide "some definite link between the illegal or suspicious activity described in an affidavit and the . . . residence [to be searched;] [*t*]*hat link must be sufficient to establish a fair probability that contraband or evidence of a crime will be found in the residence.*" *Malone*, 50 Kan. App. 2d at 173. This court has thus taken a fairly strict view as to when a single trash pull alone will support a search warrant for a residence. The circumstances need to dispel the possibility that anyone passing by the residence could have placed the contraband in the trash container. 50 Kan. App. 2d at 173.

The affidavit does not satisfy that requirement. A drug trafficker could have passed by Barnes' house after the trash container had been put out for the refuse company and well before Pickering began surveilling the scene. That possibility would have been materially negated had the paraphernalia been found in a sealed garbage bag with the mail addressed to Barnes.

Other information could have reinforced the comparatively limited inferences properly drawn from the single trash pull. For example, had Pickering or other members of the drug unit watched Barnes' house around that time and observed visitors regularly arriving and departing after staying just a few minutes, consistent with ongoing drug sales, the trash pull would have carried greater weight in establishing probable cause for a search warrant. See, e.g., *United States v. Becknell*, No. 13-10071-JTM, 2013 WL 3820018, at *3 (D. Kan. 2013) (unpublished opinion) (multiple brief visits as indicator of drug trafficking); *Sweeney v. Gansheimer*, No. 1:09CV2377, 2010 WL 4955706, at *1 (N.D. Ohio 2010) (unpublished opinion) (same). Similarly, a second trash pull a week later yielding comparable evidence would have undercut the possibility a random

9

interloper deposited the paraphernalia in Barnes' trash container. But the affidavit offers no such buttressing information. The crime stoppers tip, as we have explained, was both too remote and too vague to serve that purpose.

The district court sought to bolster the trash pull by pointing out that Hutchinson has a municipal ordinance making it unlawful to place trash in someone else's container. The district court suggested that Pickering would have been aware of the ordinance and reasonably could have inferred that it would be obeyed—so no one besides Barnes would have put anything in her trash container. We are underwhelmed by the notion that persons trafficking in drugs, a serious felony, would be deterred from disposing of evidence of their enterprise by dumping it in some random trash container because *that* conduct would be an ordinance violation. And we likewise doubt a reasonable investigator would or could rely on such a counterintuitive proposition.

In sum, the affidavit's failing for Fourth Amendment purposes rests largely on a lack of factual specificity and the repeated substitution of conclusions and generalities for assessable facts. The difference between facts and conclusions is not an esoteric legal point. It is a basic concept common to many endeavors, including law and police work. A reasonably well-trained law enforcement officer should be able to distinguish a concrete fact from an abstract conclusion. And that same officer should know that an affidavit for a search warrant must be built upon concrete facts. See *Althaus*, 49 Kan. App. 2d at 231. The affidavit, given its weaknesses, suggests either a lack of training or a disregard of training.

The exclusionary rule should be applied to deter Fourth Amendment violations attributable to intentional law enforcement conduct or "recurring or systemic negligence." *Herring*, 555 U.S. at 144. Drafting an affidavit for a search warrant that consistently substitutes conclusory representations for facts must be one or the other. The affidavit here was so lacking that a well-trained officer should have recognized its deficiency even

10

though a district court judge approved the warrant. We, therefore, cannot say the good-faith exception overrides the exclusionary rule in this case. Consistent with *Barnes I*, we find the motion to suppress should have been granted.

We reverse the district court's ruling applying the good-faith exception and remand with directions to grant Barnes' motion to suppress and for any further proceedings consistent with this opinion.

\* \* \*

POWELL, J., concurring:  I concur with the result.

\* \* \*

BRUNS, J., dissenting:  I respectfully dissent. Although I agree with the majority that the affidavit lacks probable cause as we previously found in *State v. Barnes*, No. 114,125, 2016 WL 7031847, at \*5 (Kan. App. 2016) (unpublished opinion) (*Barnes I*), I do not find that it was unreasonable for the law enforcement officers to believe the search warrant was valid under the circumstances presented. In other words, I do not find this to be a case in which there was so little indicia of probable cause in the affidavit that a reasonable law enforcement officer would override the probable case determination found by the district judge who signed the search warrant. See *State v. Zwickl*, 306 Kan. 286, 297, 393 P.3d 621 (2017); *State v. Hoeck*, 284 Kan. 441, 464-65, 163 P.3d 252 (2007).

As the United States Supreme Court has held, "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 921, 104 S. Ct. 3405, 82 L. Ed. 2d

11

677 (1984). Absent unusual circumstances, "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." 468 U.S. at 921. If a search is conducted pursuant to a search warrant obtained from a judge or magistrate, the warrant is normally sufficient to establish the good faith of a law enforcement officer in conducting a search. 468 U.S. at 922.

In applying *Leon* and its progeny, our Supreme Court has found that "[t]he threshold to avoid the *Leon* good-faith exception is a high one." *State v. Powell*, 299 Kan. 690, 701, 325 P.3d 1162 (2014). In determining whether this high threshold has been met, we must "evaluate whether it was entirely unreasonable for the officers to believe the warrant was valid . . . ." 299 Kan. at 701. We do so by looking to the affidavit offered in support of the search warrant in its entirety to determine "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" 299 Kan. at 701 (quoting *Leon*, 468 U.S. at 922 n.23).

In *Zwickl*, our Supreme Court found it to be significant that "two different courts looked at the same [affidavit] and arrived at opposite conclusions about the indicia of probable cause and how an objectively reasonable law enforcement officer would view the affidavit's contents after the judge issued the warrant." 306 Kan. at 295. In such cases, "[t]he quandary for the officer is apparent and underscores the [probable cause] continuum described in *Hoeck*." 306 Kan. at 295. Similarly, in this case, we have two courts—the district court and our court—that have examined the affidavit and reached opposite conclusions regarding probable cause. We also have two experienced judges—the one who authorized the search warrant and the one who presided over the initial suppression hearing—who both found that the affidavit provided sufficient probable cause to support the warrant.

12

Although there are problems with the affidavit as we noted in *Barnes I* and as the majority notes above, I would find that it contains a sufficient indicia of probable cause to meet the *Leon* good-faith exception. Much of the affidavit relates to Arthur Adams being involved in the distribution of drugs. Through surveillance, law enforcement officers observed that Adams frequently visited Barnes' residence both in the day and at night. Officers observed Adams going from Barnes' residence and engaging in apparent drug transactions at other locations. Moreover, a note with the name "Arthur" written on it, a broken glass pipe with burnt residue, numerous small used ziplock baggies—one which field-tested as being positive for methamphetamine, sandwich baggies with the corner torn off, and used syringes were discovered in a trash pull at Barnes' residence.

Under the circumstances presented, it does not appear to be "entirely unreasonable" for the law enforcement officers to believe the search warrant was valid. Furthermore, I am not convinced that a reasonable law enforcement officer would have rejected the probable cause determination made by the district court judge and refused to execute the warrant once it was signed. Accordingly, I would affirm the district court's decision applying the good-faith exception and denying the motion to suppress.