NOT DESIGNATED FOR PUBLICATION

No. 126,312

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRIAN R. CUMMINGS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ellis District Court; THOMAS DREES, judge. Oral argument held September 17, 2024. Opinion filed March 28, 2025. Affirmed.

*Mark E. Hartman*, of Bath & Edmonds, P.A., of Leawood, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., ISHERWOOD and PICKERING, JJ.

PER CURIAM: Brian R. Cummings stands convicted of one count each of possession with intent to distribute alprazolam (Xanax), MDMA, and ketamine. He brings this appeal to challenge the district court's denial of his pretrial motion to suppress evidence seized during the execution of a residential search warrant. Cummings challenges the integrity of the probable cause set forth in the search warrant affidavit and contests the district court's finding that the good-faith exception applied. We conclude that to the extent the probable cause foundation for the warrant is plagued by any infirmities, they are of no moment because we agree with the district court's conclusion that the good-faith exception ultimately applies to uphold issuance of the warrant. Accordingly, the denial of Cummings' motion to suppress is affirmed.

1

On the evening of October 10, 2021, Hays Police Department Master Patrol Officer Derick Nordell conducted a traffic stop of a vehicle driven by A.M., a teenager. Nordell detected the odor of marijuana and arrested A.M. upon his acknowledgment that he had marijuana in the car.

Nordell detained A.M. in his police cruiser. While A.M. initially denied knowing the precise quantity of drugs located within his vehicle, he eventually admitted that a few grams of marijuana could be found inside. Nordell searched A.M.'s vehicle and discovered a cache of narcotics and paraphernalia that far exceeded the meager amount A.M. attested to. The officer uncovered 51.2 grams of marijuana and 34.1 grams of THC wax, several grams of marijuana concentrate, over 100 Xanax pills, 2 capsules bearing MDMA residue, and various items of drug paraphernalia which contained residue, including a digital scale, pipe, plastic baggie, and grinder. Cigarillos, a lighter, a marijuana dispensary receipt, $507 in U.S. currency, and four cell phones were also recovered from A.M.'s vehicle.

A.M. denied any knowledge as to the rightful owner of the money and drugs. Officer Nordell informed the youth that it was obvious from the search of the vehicle that someone was dealing drugs and if A.M. told the truth he would note as much in his report. The officer suggested that A.M. was dishonest during their initial discussion about the quantity of marijuana in the vehicle, and A.M. pushed back on that notion but also continued to refuse to identify the owner of the drugs Nordell recovered.

A.M. eventually admitted that he purchased the drugs but declined to reveal the supplier's identity without some assurance he would be spared a trip to juvenile detention. A.M. initially stated that he met his supplier earlier that evening but then retracted the statement and resumed his stance that he had no knowledge of the supplier's identity or

location. However, battling the corresponding fear that he would face harsher criminal sanctions if he lied to the officer, A.M. gradually revealed more information about his supplier, including the fact the person sold marijuana, MDMA, Xanax, fentanyl-laced Xanax, and ketamine.

Officer Nordell transported A.M. to the police station and continued to encourage him to reveal the identity of his supplier. A.M. reiterated that his disclosure of any additional information was contingent upon the officer's ability to ensure A.M. did not spend the night in juvenile detention. A.M. eventually shared that his supplier's first name was Brian but declined to offer further details. Officer Nordell left the room then returned a short time later to inform A.M. that preparations were in place for A.M. to return home that night. A.M. then divulged that his supplier's full name was Brian Cummings, and he was a white, blonde, college-aged male, who A.M. contacted either by phone or through Snapchat to purchase drugs. A.M. explained that he and Cummings conducted business either in A.M.'s car in the alley behind Cummings' house or Cummings invited him inside his home to complete their transactions. A.M. provided Officer Nordell with a description of the types of drugs he observed inside Cummings' house and the prices Cummings charged for each. A.M. was unable to provide the exact address for Cummings' house but collaborated with Nordell to create a map that provided a geographical illustration of its location.

A.M. shared that when he visited Cummings' house roughly two weeks earlier, Cummings remarked that he needed to "re-up" his marijuana supply despite already having what appeared to A.M. to be 2 to 2.5 pounds of marijuana inside his residence. A.M. told Officer Nordell that he purchased 50 MDMA pills from Cummings the previous week for about $300. Finally, A.M. disclosed that he met with Cummings on both the eve of the traffic stop and again the night of the stop and purchased 40 Xanax pills for $40 on both occasions. According to A.M., Cummings had several pounds of

Xanax pills stored in large vacuum sealed bags inside his residence, including some laced with fentanyl that were imprinted with "M30" as a distinguishing feature.

Officer Nordell verbally and electronically conveyed the information A.M. provided about Cummings to Detective David Gillan. The following day, A.M. voluntarily returned to the police station and consented to a further discussion with law enforcement officers. Detective Gillan interviewed A.M. and shared that the prosecutor would appreciate any help A.M. could offer but the detective did not offer A.M. any express personal assurances of leniency. A.M. reiterated to Gillan that he purchased Xanax from Cummings on several occasions including the day Officer Nordell pulled him over. A.M. further shared that he and a group of friends pooled together several hundred dollars to purchase illegal drugs from Cummings on the day of the stop, including the Xanax pills that Officer Nordell found in the vehicle. A.M. repeated for the detective that Cummings had more than 100 pills on hand, and that those bearing an "M30" imprint were laced with fentanyl. A.M. clarified that while he purchased marijuana from Cummings in the past, the marijuana Nordell seized during the traffic stop was not purchased from Cummings. A.M. again provided directions to Cummings' house in lieu of a specific street address. When Detective Gillan showed A.M. a Facebook picture of Cummings, however, A.M. was purportedly unable to discern whether the person depicted in the photo was Cummings.

Two days after the interview, Detective Gillan searched the trash at Cummings' residence but did not recover anything of evidentiary value. Based on the information gleaned from A.M.'s various discussions with law enforcement officers, Gillan applied for a search warrant for Cummings' house and vehicle. The affidavit he presented in support of the warrant omitted any reference to A.M.'s prior criminal history and did not reveal that initially A.M. was not forthcoming about Cummings' identity and the specific drug transactions he engaged in with Cummings. The affidavit otherwise comprehensively outlined the information A.M. provided during his two law enforcement

interviews. Chief District Court Judge Glenn Braun authorized the warrant. The subsequent search of Cummings' residence yielded hundreds of Xanax pills, 34 grams of MDMA, 29 grams of ketamine, 122 grams of mushrooms, 2 grams of a crystal-like substance, a THC vape pen, THC edibles, and assorted paraphernalia, including pill capsules, digital scales, a marijuana dispensary bag with receipt, a mushroom grow kit, a glass jar, a razor blade, pipes, a grinder, rolling papers, and various plastic baggies.

Cummings filed a pretrial motion to suppress the drug evidence on the grounds that the search of his home was not supported by probable cause and the officers who executed the warrant were not eligible for protection under the good-faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The district court conducted a full evidentiary proceeding to resolve Cummings' motion to suppress and allow him a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to address his claims that omissions from the search warrant affidavit undermined its veracity. The district court ultimately denied the motion and issued an extensive written order detailing the foundation for its conclusion that the totality of the circumstances outlined in the affidavit demonstrated adequate probable cause to support the issuance of the warrant. Additionally, it rejected Cummings' contentions that the warrant could not be saved through operation of the good-faith exception because Detective Gillan deliberately omitted material facts or made statements in reckless disregard of the truth and because the warrant lacked adequate indicia of probable cause that a reasonable, well-trained, law enforcement officer could rely on as lawful.

The case proceeded to a bench trial on stipulated facts, and Cummings was convicted of one count each of possession with intent to distribute Xanax, MDMA, and ketamine. The district court sentenced him to serve 15 months' imprisonment for the Xanax conviction, followed by 18 months' probation for the MDMA and ketamine offenses, each of which carried underlying prison terms of 15 months.

Cummings now brings his case before this court for a determination of whether the affidavit Detective Gillan presented in support of the search warrant for Cummings' residence was plagued by fatal deficiencies and whether the good-faith exception lawfully applies to uphold the warrant.

LEGAL ANALYSIS

*The district court properly concluded that the good-faith exception applied to preserve the search warrant executed upon Cummings' residence.*

Cummings brings a multi-faceted Fourth Amendment claim to us for review. His first three issues challenge the district court's conclusion that the residential search warrant was grounded in a firm probable cause foundation. In his fourth and final claim of error he requests that we analyze whether, given the particular facts and circumstances of his case, the district court erred in finding that the good-faith exception applied to uphold the search warrant.

To be reasonable, a search must be (1) "lawful at its inception," and (2) "executed in a reasonable manner." *Illinois v. Caballes*, 543 U.S. 405, 407-08, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). When a search is conducted in violation of the protections afforded an individual under the Fourth Amendment to the United States Constitution, the exclusionary rule generally operates to bar the admission of any evidence resulting from that unreasonable intrusion with the specific goal of deterring law enforcement officers from committing Fourth Amendment violations in future cases. *State v. Hillard*, 315 Kan. 732, 747, 511 P.3d 883 (2022). That is, the rule is intended "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009). But the fact a Fourth Amendment violation occurred—that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. *Illinois v. Gates*, 462 U.S. 213, 223, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Indeed, exclusion

6

"has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006).

In *Leon*, however, the United States Supreme Court concluded that the rule should not be applied in those cases where a detached and neutral judge issued a search warrant and a law enforcement officer—acting in good faith—reasonably relied on the warrant because application of the rule in such circumstances does not further its overall purpose for deterrence. 468 U.S. at 916-21. Stated another way, where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate judge and the executing officers act within its scope, there is nothing to deter. 468 U.S. at 920-21. That determination gave rise to what is now known as the good-faith exception. 468 U.S. at 913, 922. The *Leon* Court stated: "We . . . conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918. "When an officer searches pursuant to a warrant, *Leon* generally requires we presume the officer acted in good-faith reliance upon the warrant." *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010).

The Kansas Supreme Court adopted the good-faith exception as the law in Kansas in *State v. Hoeck*, 284 Kan. 441, 464, 163 P.3d 252 (2007). But there are also four circumstances in which the good-faith exception does not apply, what might be viewed as exceptions to the exception:

> "(1) [t]he magistrate issuing the warrant was deliberately misled by false information; (2) the magistrate wholly abandoned [a judge's] detached or neutral role; (3) there was so little indicia of probable cause in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized." *State v. Powell*, 299 Kan. 690, 700, 325 P.3d 1162 (2014) (citing *Leon*, 468 U.S. at 923).

These kinds of circumstances should not occur often. *State v. Althaus*, 49 Kan. App. 2d 210, 222, 305 P.3d 716 (2013). In *State v. Zwickl*, 306 Kan. 286, 295, 393 P.3d 621 (2017), our Supreme Court explained that the threshold which must be cleared to avoid application of the *Leon* good-faith exception is a high one:

> "Our task is to 'evaluate whether it was entirely unreasonable for the officers to believe the warrant was valid. . . .' [*Powell*, ]299 Kan. at 701. To do so, 'we look to the affidavit in its entirety' and determine '"whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."' *Powell*, 299 Kan. at 701 (quoting *Leon*, 468 U.S. at 922 n.23). So long as the affidavit contained more than '"bare bones,"' the officers' reliance on the warrant was reasonable. See *Hoeck*, 284 Kan. at 452. Other courts have described the affidavit content sufficient to invoke the good-faith exception as information establishing a 'minimal nexus between the place to be searched and the suspected criminal activity.' *United States v. Augustine*, 742 F.3d 1258, 1263 (10th Cir. 2014)."

*Standard of review*

When reviewing the denial of a motion to suppress evidence, this court determines whether the factual findings underlying the district court's decision are supported by substantial competent evidence. The appellate courts do not reweigh the evidence or reassess the credibility of the witnesses. The ultimate legal conclusion drawn from those factual findings are reviewed under a de novo standard. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). Whether a court has correctly construed the good-faith exception is a question of law, so we must review that question independently, without any required deference to the district court. *Hoeck*, 284 Kan. at 447-48.

K.S.A. 22-2502(a) directs that a search warrant shall be issued only when the statements in support of that warrant allege "facts sufficient to show probable cause that a crime has been, is being or is about to be committed" and "particularly describe[] a person, place or means of conveyance to be searched and things to be seized." Therefore,

8

"'[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Fisher*, 283 Kan. 272, 300, 154 P.3d 455 (2007).

When a defendant challenges the efficacy of the affidavit a law enforcement officer submitted in support of their application for a search warrant, the reviewing court employs a deferential standard. We do not determine, as a matter of law, whether probable cause existed; rather we simply analyze whether the "affidavit provided a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched." *State v. Adams*, 294 Kan. 171, 180, 273 P.3d 718 (2012). Because we can evaluate the undisputed content of the affidavit, we conduct our own review of the affidavit's sufficiency using this deferential standard. 294 Kan. at 180.

Cummings' appeal to this court included a series of issues which sought to challenge the district court's finding that the search warrant was supported by probable cause, as well as a claim that the district court erred in finding that the good-faith exception was triggered by the facts and circumstances of this case. Typically, an inquiry into the applicability of the *Leon* good-faith exception arises once a court determines that a search warrant affidavit fails to establish a substantial basis for probable cause. *State v. Malm*, 37 Kan. App. 2d 532, 548, 154 P.3d 1154 (2007). But in reviewing suppression motions, appellate courts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question. See *Leon*, 468 U.S. at 924-25; see also *United States v. Bishop*, 890 F.2d 212, 216 (10th Cir. 1989) ("[R]esolution of whether there was probable cause supporting the warrant is not necessary to our decision . . . because . . . the agents' conduct clearly falls within the 'good faith exception' to the exclusionary rule."). Thus, it is not necessary for us to delve

into an analysis of Cummings' probable cause claims because the district court judge was also satisfied that the good-faith exception applied to uphold the warrant in this case.

The issues Cummings raises with respect to the good-faith exception are grounded in the first and third exceptions set out above—whether the issuing magistrate was deliberately misled by false information and whether the affidavit was so lacking in indicia of probable cause that it was entirely unreasonable for the officers to believe the warrant was valid. Again, these inquiries are properly classified as questions of law; thus, we exercise unlimited review when analyzing those claims. *Zwickl*, 306 Kan. at 294.

For *Leon* driven inquiries, the State carries the burden to demonstrate that the facts and circumstances of a particular case warrant application of the good-faith exception. 468 U.S. at 924. The presence or absence of a law enforcement officer's good faith is measured by analyzing how a reasonable officer would respond under the circumstances presented, and it is not too demanding a standard to presume that a well-trained law enforcement officer possesses "reasonable knowledge of what the law prohibits." 468 U.S. at 922 nn.20, 23. The *Leon* exception requires that a neutral magistrate occupy the space between the police officer's investigatory goals and the people's Fourth Amendment rights. 468 U.S. at 913, 920-21. It is "only when an officer's reliance on [a] warrant is '*wholly unwarranted*' that good faith is absent, and the evidence acquired should be suppressed." *United States v. Pacheco*, 884 F.3d 1031, 1045 (10th Cir. 2018). "The court gives great deference to a search warrant that was reviewed and signed by an experienced judge." *United States v. Brown*, 586 F. Supp. 3d 1075, 1083 (D. Kan. 2022) (citing *Leon*, 468 U.S. at 914; *United States v. Price*, 265 F.3d 1097, 1011 [10th Cir. 2001]).

The district court was not persuaded that Detective Gillan deliberately or recklessly omitted information from the affidavit, or that the omitted information would have altered the issuing magistrate's probable cause finding. Thus, it declined to find that application of the good-faith exception was foreclosed by the first factor.

10

Cummings' contention regarding the third exception was likewise rejected by the district court. In support of his conclusion, the judge explained that under the totality of the circumstances—the details surrounding A.M.'s arrest, the drugs seized from his vehicle, the detailed information A.M. provided to law enforcement officers, and the extensive amount of experience possessed by the issuing magistrate—Detective Gillan had no reason to question the validity of the warrant. Thus, it could not be said that the affidavit was so lacking in any indicia of probable cause that it was entirely unreasonable for a trained law enforcement officer to rely on its contents. Accordingly, the good-faith exception remained a viable avenue by which to uphold the warrant executed upon Cummings' residence.

A proper review of the district court's decision requires this court to analyze the affidavit Detective Gillan prepared for the search warrant alongside the information omitted from the affidavit to determine whether there was probable cause to justify issuance of the warrant. *State v. Landis*, 37 Kan. App. 2d 409, 416, 156 P.3d 675 (2007). Following an extensive evaluation of the record as well as a comprehensive review of the legal authority which properly articulates the analysis governing the resolution of Cummings' claims, we are satisfied there is substantial competent evidence to sustain the district court's good-faith analysis and denial of Cummings' motion to suppress. We will detail the foundation for our conclusion as we address each of Cummings' issues in turn.

1. *The information Detective Gillan omitted from his search warrant affidavit was neither material nor excluded to deliberately mislead the issuing magistrate.*

The *Leon* Court established that evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is reasonably relied on by the executing officer in objective good faith. 468 U.S. at 916. However, the deference given to such warrants "is not boundless." 468 U.S. at 914. As explained above, there are several contexts in which the good-faith exception has no application,

11

the first being where an issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." 468 U.S. at 923. Omitting material information from an affidavit is equivalent to including false material for purposes of the good-faith analysis. *State v. Probst*, 247 Kan. 196, 206, 795 P.2d 393 (1990). When reviewing the omission of facts from an affidavit there are two questions we must resolve: (1) Was the exclusion part of a plan to deliberately mislead the reviewing magistrate, and (2) is the information omitted properly characterized as "material"? *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982); *Landis*, 37 Kan. App. 2d at 415. "Deliberate" is defined as "1. Intentional; premeditated; fully considered. 2. Unimpulsive; slow in deciding." Black's Law Dictionary 539 (11th ed. 2019). Material information is that which is necessary to a judge's determination of whether probable cause exists. *State v. Adams*, 294 Kan. 171, 179, 273 P.3d 718 (2012).

As support for his claim that this first exception forecloses operation of the good-faith exception in his case, Cummings directs our attention to a multitude of omissions from the affidavit which he asserts were the product of Detective Gillan's deliberate conduct. He further contends that had the excluded information been made part of the affidavit the issuing magistrate would not have found the document set forth adequate probable cause.

As noted above, before we can analyze whether Detective Gillan made deliberate omissions and, if so, what impact they carried, if any, we must first review the information outlined in the search warrant affidavit from the four corners of the document alone. See *Malm*, 37 Kan. App. 2d at 543. There is no dispute that the affidavit clearly stated the location to be searched and the items to be seized. The affidavit also clarified that the crimes under investigation included distribution of a certain depressant; distribution of marijuana; distribution of opiate/opium/narcotic/stimulant/heroin; and

possession of drug paraphernalia. Gillan set out the facts in support of his affidavit in 24 separate points that we believe are important to reprint below:

"1.  This application is based on the investigations and reports of your affiant, Hays Police Department Corporal Dakota Reese, Hays Police Department Master Patrol Officer Derick Nordell, and Hays Police Department Officer Joseph Lantz.

"2.  On 10/11/2021 your affiant was contacted by Hays Police Department Master Patrol Officer Derick Nordell.

"3.  MPO Nordell told your affiant he conducted a traffic stop on the evening of 10/10/2021 in which he had contact with AM (YOB: 2004), who hereafter will be referred to as AM, BB (YOB: 2004), who hereafter will be referred to as BB, and AR (YOB: 2004), who hereafter will be referred to as AR.

"4.  MPO Nordell told your affiant the odor of marijuana was detected during his traffic stop and a search of the vehicle took place.

"5.  This vehicle was a red 1998 Oldsmobile Intrigue bearing KS license plate 012PAM.

"6.  Your affiant reviewed MPO Nordell's report and observed the following items were located during the search of the vehicle:

   a.  51.2 grams of marijuana
   b.  34.1 grams of THC wax
   c.  2 THC containers with THC concentrates (72.3 grams when weighed in containers)
   d.  109 Blue Xanax (Alprazolam 2mg) pills
   e.  Two clear pill capsules with a white residue
   f.  Titos Vodka
   g.  1 black and silver digital scale with marijuana residue
   h.  1 silver metal straw THC Pipe with residue
   i.  4 packs of cigarillos
   j.  1 gallon zip lock baggie with marijuana residue
   k.  1 marijuana dispensary receipt
   l.  1 green BIC lighter
   m.  1 stone grinder with marijuana residue
   n.  $507 in US currency

13

    o.   1 white and pink apple Iphone

    p.   1 red apple Iphone 7+ with clear case

    q.   1 purple apple Iphone 12 with purple case

    r.   1 black TCL Smartphone

"7.  MPO Nordell's narrative reflects that he transported the above evidence to the LEC where it was then weighed and tested.

"8.  MPO Nordell's narrative reflects he used a Nark II Dequenois-Levine Reagent kit to test the suspected marijuana (The above listed 51.2 grams of marijuana and the 34.1 grams of THC wax). The result was presumptive positive for tetrahydrocannabinol which is the illegal chemical located in marijuana.

"9.  Your affiant reviewed Cpl. Reese' s narrative. In Cpl. Reese's narrative he states while at the law enforcement center he, Cpl. Reese, conducted a field test on the white residue located inside the clear plastic pill capsules.

"10.  Cpl. Reese's narrative reflects he used a Marquis Reagent test kit to test this residue and he received a presumptive positive result for Methylenedioxymethamphetamine (MDMA / Ecstasy).

"11.  Your affiant knows from training and experience that MDMA is also referred to as Molly and that Molly is generally stored in clear plastic capsules.

"12.  Ofc. Nordell told your affiant he later conducted an interview with AM while at the LEC. Ofc. Nordell informed your affiant he learned the following information from AM during this interview

    a.   AM stated that he frequently buys Xanax (Alprazolam), Molly (MDMA), and marijuana from an individual named Brian Cummings who resides at [address omitted], Hays, Ellis County, Kansas.

    b.   Martinez stated approximately two weeks prior from the date of 10/10/2021, he was in Brian's residence where he (AM) observed what he described as 2 to 2.5 pounds of marijuana and that Brian was stating he was needing to re-up.

    c.   AM stated that approximately 1 week ago from the date of 10/10/2021, he purchased (50) Molly capsules from Brian and paid approximately $300.

    d.   AM stated that on 10/09/2021 and 10/10/2021 he purchased 40 pills of Xanax from Brian for $40 per night.

e.  AM stated Brian had pounds of Xanax pills and pounds of Xanax pills that were laced with fentanyl still inside his home.

f.  AM described the pills as being in vacuum sealed bags and described these bags as being comparable in size to a 2-gallon Ziplock bag.

g.  AM said in these vacuum seal bags he observed both regular Xanax and Xanax that was laced with fentanyl. He described the Xanax fentanyl pills as being blue in color and having the imprint of M30.

h.  AM stated he normally contacts Brian by calling him on his cell phone or by using the app called snapchat.

i.  AM stated Brian will either bring the illegal drugs out to the car in the alley or will invite AM into the house to complete the sale.

"13.  On 10/11/2021 your affiant spoke with AM while at the LEC.

"14.  AM told your affiant that he typically purchases Xanax from an individual named Brian Cummings.

"15.  AM told your affiant that he typically pays $2.00 per Xanax pill.

"16.  AM stated he purchased Xanax from Brian on the same date of the traffic stop, 10/10/2021, and the Xanax pills located inside the vehicle had been the ones he had purchased from Brian while at Brian's residence on 8th Street.

"17.  AM stated that he and a group of unnamed friends provided Brian approximately $400 on 10/10/2021 to purchase illegal drugs, including the Xanax that was in the car.

"18.  AM denied purchasing the marijuana from Brian that was in the vehicle, but he also did acknowledge that he has purchased marijuana from Brian in the past.

"19.  Your affiant asked AM how much Xanax Brian had on hand. AM replied, 'A lot' and described this number as more than 100 pills.

"20.  Your affiant asked AM about the M30 pills. AM told your affiant these pills would contain fentanyl and he knew this because Brian had told him this.

"21.  On 10/13/2021 your affiant collected the trash located in the blue poly-cart located behind the residence of [address omitted].

"22.  Your affiant searched the contents of the trash bags. Nothing of evidentiary value was located.

"23.  Your affiant is aware from training and experience that individual[s] involved in the sale of illegal drugs will commonly use their motor vehicles to store and/or transport these illegal drugs.

15

"24. Your affiant accessed the Hays Police Department data base that showed an entry from 07/24/2021 where contact had been made with Brian Cummings. He was listed as a tenant at the address of [address omitted]."

Gillan's affidavit is largely a manifestation of discussions A.M. shared with law enforcement officers. A.M. told Officer Nordell and Detective Gillan that Cummings was selling marijuana, MDMA, Xanax, and fentanyl-laced Xanax out of his home in Hays and that he purchased drugs from Cummings on several occasions at his residence. In this regard, A.M. is properly characterized as an informant.

When an informant shares information with a law enforcement officer that is then relied upon in formulating a search warrant, the probative value of that tip must be subject to scrutiny. *State v. Hensley*, 298 Kan. 422, 431, 313 P.3d 814 (2013). This analysis, which takes into account the totality of the circumstances surrounding the information, necessarily includes both the informant's veracity as well as the foundation for their knowledge. However, these two factors are not granted "'independent status.'" 298 Kan. at 431. Rather, if a deficiency is evident in one of the two components it "'may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability.'" 298 Kan. at 431.

Several critical factors make up the analysis. First, whether the informant's statements have been verified as accurate or otherwise corroborated in some way. See *State v. Hicks*, 282 Kan. 599, 615, 147 P.3d 1076 (2006). Next, whether the informant provides law enforcement with their name and address or provides enough personally identifying details to be held accountable for the information they provided. *State v. Slater*, 267 Kan. 694, 700, 986 P.2d 1038 (1999). An informant's motives, however questionable, "do not necessarily prohibit reliance on information" they provided. *Hensley*, 298 Kan. at 432. But when the informant "has been implicated in another crime and is acting in the hope of gaining leniency," the reliability of their information cannot

16

be presumed. *Landis*, 37 Kan. App. 2d at 418-19. An independent police investigation which yields corroborating evidence may help establish probable cause even when there is a shortage of evidence to otherwise demonstrate that an informant is trustworthy and credible. See 37 Kan. App. 2d at 420.

Against that backdrop, Cummings asserts we must be skeptical of the information A.M. provided given the seriousness of the charges A.M. potentially faced as a result of the significant quantity of narcotics seized from his vehicle and his willingness to cooperate with law enforcement officers. Information from named informants is typically considered reliable without corroboration. *State v. Musick*, 30 Kan. App. 2d 76, 78, 38 P.3d 144 (2002). But when a named informant is a participant in the crime and provides information to law enforcement officers with the hope of leniency, that presumption of reliability no longer applies, and officers must either corroborate the information or demonstrate the informant's truthfulness and reliability. *Landis*, 37 Kan. App. 2d at 419. Corroboration of the defendant's address alone is insufficient to establish the truthfulness or reliability of the informant. 37 Kan. App. 2d at 419.

The affidavit reflects that Detective Gillan verified that Cummings lived at the residence referenced by A.M. and two days after his meeting with A.M. the detective conducted a trash pull at the residence, although it did not yield anything of evidentiary value. Notably, the affidavit also demonstrates that A.M. made a significant drug purchase from Cummings the night of the traffic stop and purchased significant quantities of drugs from him on three separate occasions within that same week, with each purchase occurring at Cummings' residence. Here, there is a named informant—which carries with it some presumption of reliability—but that reliability may arguably be undermined by his hope for leniency and the officers' failure to independently corroborate the information. However, a lack of corroboration from the trash pull and A.M.'s self-interest do not strike a fatal blow to his credibility here in light of the detailed information he provided about the various types of drugs Cummings sold and that A.M. repeatedly

17

purchased, the manner in which Cummings packaged the drugs, and the remarkable quantities of those drugs that Cummings had available in his home.

Cummings also argues that the affidavit Detective Gillan submitted was plagued by the deliberate omission of material information that would have directly impacted the reviewing magistrate's ability to ascertain whether probable cause existed to issue the residential search warrant. "A person attacking an affidavit on the basis that it omitted information must prove that the omission was both deliberate and material." *State v. Colbert*, 257 Kan. 896, 905, 896 P.2d 1089 (1995). In other words, Cummings must establish that inclusion of these omitted facts would have had some bearing on the issuing judge's probable cause determination. *Adams*, 294 Kan. at 179; *Lockett*, 232 Kan. at 320 (Materiality determined by inquiring whether the judge issuing the search warrant would have found probable cause if the omitted material had been included.). We will examine each excluded point of information in turn.

The first omission Cummings asks us to analyze involves what he describes as "the many ways AM changed his story or attempted to mislead [Officer] Nordell throughout Nordell's questioning." In particular, he directs our attention to the fact that "AM initially told [Officer] Nordell he knew nothing about any marijuana in the vehicle," but later stated there was merely an insignificant amount of the drug in the car. Cummings argues that A.M.'s assertions concerning the quantity of marijuana in the vehicle stood in stark contrast to the truth given the subsequent search of the vehicle yielded an amount roughly 15 times greater than what A.M. claimed was inside.

The difficulty we encounter with Cummings' claim is that it runs contrary to the established facts of the case. Our review of the record reveals that shortly after Officer Nordell made initial contact with A.M. at the driver's side window of the vehicle, Nordell remarked about the presence of the odor of marijuana and A.M. unequivocally acknowledged that he had marijuana in the car. That admission resulted in A.M.'s arrest a

18

few short moments later. A.M. told Nordell there was only a meager amount of marijuana in the vehicle, but a short time later, A.M. also stated that there was a bag of marijuana in the back and, essentially, marijuana everywhere.

Cummings has failed to sustain his burden to show that the officer's failure to include this timeline regarding A.M.'s admissions to the marijuana in the car was both deliberate and material. First, we are not persuaded that the challenged information was intentionally excluded to deliberately mislead the reviewing judge. Additionally, we are unable to conclude that these comments are material under the circumstances. The affidavit clearly established that the officer pulled over A.M.'s car, noticed the odor of marijuana, and conducted a search which in turn led to the discovery of a litany of illegal drugs. It simply does not include every statement that A.M. made to the officers or vice versa. Even so, given the significant collective details set out in the affidavit, this court cannot imagine that A.M.'s attempts to downplay his culpability would have impacted the experienced magistrate's decision to find probable cause to issue the search warrant. Thus, while Detective Gillan made the decision to not include these precise statements in the affidavit, we decline to find that he did so deliberately as a subterfuge to impermissibly obtain the residential search warrant or that their absence undermines the reliability of the affidavit.

The next omission highlighted by Cummings likewise does not have support in the record, or at least not in the light in which he endeavors to have us view it. He challenges Detective Gillan's failure to include information in the affidavit that Officer Nordell knew that A.M. was "'never . . . up front and honest'" with the officer during their prior interactions. The testimonial evidence, however, reveals that Officer Nordell employed that phrase as an interview technique with A.M. to elicit information from him. Notably, Nordell specifically testified at the suppression hearing that he could not recall any prior dealings he had with A.M. when A.M. was dishonest and, further, that "there have been times where [A.M.] has been helpful or honest." Finally, Officer Nordell testified that

19

during the interview, A.M. expressed awareness of the consequences for lying to law enforcement officers—that he would have to spend the remainder of his juvenile years in detention. Accordingly, we do not find that this claim evidences a deliberate exclusion of material information concerning A.M.'s credibility where the record does not support Cummings' interpretation of the statement.

The final claim that Cummings asks us to analyze is what impact it had on the reviewing magistrate when Detective Gillan failed to include the fact that A.M. was not forthcoming with the detective about who rightfully owned the THC wax seized from A.M.'s vehicle. We do not find Cummings' contention persuasive and the reasoning behind that is two-fold. There is no indication, by way of a citation to the record from Cummings, which affirmatively demonstrates that the wax either belonged to A.M. or that he truly could identify which of the three occupants in the vehicle that night was the rightful owner of the wax. That is to say, there is nothing against which to measure the veracity of A.M.'s statement. It is entirely possible that A.M. did not know who the rightful owner of the THC wax was, or that he was trying to cover for the friends he was traveling with that night. In either case, the detective's failure to include that fact in the affidavit is not indicative of the detective's deliberate exclusion of information for the purpose of misleading the judge. Nor are we satisfied that this is at all material to the probable cause determination such that the inclusion of this fact would have altered the reviewing judge's probable cause finding. Accordingly, A.M. has fallen short of satisfying his burden to demonstrate the omission was deliberate and material.

Cummings next directs our attention to remarks made by A.M. in which he vacillated between whether or not he knew the identity of the person from whom he acquired the drugs that were seized from his vehicle. In one instance, A.M. told Officer Nordell that he knew but would not disclose the name to the officer but then shifted course a few short moments later and claimed not to know. At another point, A.M. told

Nordell, "'You want to know who I bought it from? I don't even know their name, because I met them tonight, three hours ago.'"

As we have stated, success in these claims requires Cummings to establish that Detective Gillan excluded the statements to deliberately mislead the magistrate in his probable cause determination and that had the information been included, the outcome for that finding would have been different. We are unable to conclude that standard has been satisfied here. This was not a situation akin to that encountered by the *Landis* court where the informant offered a variety of sources from where she purchased the drugs. While A.M.'s remarks reflect a pattern of obfuscation, they do not likewise illustrate a pattern of deceit that calls his credibility into question as illustrated by *Landis*. It does not provide a sufficient foundation to sustain Cummings' burden to establish that Detective Gillan was motivated to deliberately exclude the statements and that had he not done so, the issuing magistrate would have arrived at a different conclusion concerning whether there was probable cause to issue the warrant.

The next point that Cummings requests us to analyze is the absence of information tending to indicate that A.M. possibly shared information with law enforcement officers with the hope of obtaining leniency when his own criminal conduct was eventually addressed. As support for his contention, Cummings conclusively asserts that "AM's cooperation depended on AM not being booked into the juvenile detention center," that the officer ultimately did not book A.M. into the juvenile detention center, and that Officer Nordell "explicitly floated the prospect that AM's cooperation could earn him leniency" with the county attorney. Implicit in this contention is that A.M.'s statements were not trustworthy because he had improper motivation.

The district court rejected this contention and found that A.M., like many others involved in the drug culture, provided information about his supplier to avoid trouble or to "acquire favorable consideration from the prosecution," neither of which rendered the

21

information less credible. The district court concluded that while inclusion of the information may have been the better practice, its absence did not serve to mislead the court.

It is important to view these remarks in the full context in which they were made. Specifically, the record shows that Officer Nordell clearly and repeatedly informed A.M. that the officer lacked any authority to guarantee that A.M. could return home that evening rather than get booked into detention. Notably, when Officer Nordell mentioned the potential for leniency through the county attorney, A.M. remarked that the prosecutor would never go for it given his history.

As our Supreme Court has held, "[a]n informant's unexpressed, questionable motives do not necessarily prohibit reliance on information that informant supplies." *Hensley*, 298 Kan. at 432. The Tenth Circuit has likewise acknowledged that judges issuing search warrants are frequently aware, even without the benefit of an explicit statement in the affidavit, that many informants "'may only be assisting police to avoid prosecution for their own crimes.'" *United States v. Morin*, 188 Fed. Appx. 709, 712 (10th Cir. 2006) (unpublished opinion) (quoting *United States v. Avery*, 295 F.3d 1158, 1168 [10th Cir. 2002]). In *Morin*, for example, the defendant argued that the affiant omitted material information from the warrant affidavit when he failed to note that an informant was "a recently arrested methamphetamine user who agreed to be an informant in the hope that he would receive leniency from prosecutors." 188 Fed. Appx. at 712. The court rejected that argument and found that other facts in the affidavit—namely, that the informant purchased methamphetamine from Morin in the past—were sufficient to alert the judge that the informant may have had self-serving reasons for being cooperative. 188 Fed. Appx. at 712.

Given that A.M. was arrested in possession of a significant quantity of drugs, among a host of other items that tended to evidence his extensive involvement with

drugs, potentially elevating his conduct beyond possession to the act of distribution, the failure to disclose a self-serving motivation for sharing information with law enforcement officers does not reasonably undermine the validity of the issuing magistrate's probable cause determination. Moreover, presumably if an offender receives favorable treatment from the State, it is because they have provided information which is useful to the State in some regard, that is, truthful and accurate so that it might advance their investigations. This is a fact that would be well known to the issuing magistrate in this case given his extensive experience both as an attorney and as a judge. Accordingly, A.M.'s desire to share information with law enforcement does not wholly undermine his credibility.

This brings us to Cummings' next contention, which challenges the statement included in Detective Gillan's application that indicated A.M. provided Officer Nordell with a street address for Cummings, when A.M. did not provide the precise address. In advancing this challenge, Cummings intimates that no such personal identifying information was communicated by A.M., a claim that is belied by the record before us. On the contrary, Officer Nordell testified that he and A.M. jointly created a rough diagram of where Cummings lived, and A.M. provided him with enough geographically descriptive points detailing the location, to enable the officer to "zero in on an area of town." The specific points shared by A.M. described Cummings' house as located on 8th Street, on the opposite side of the liquor store and near Main Street, in the direction of the bars and Frontier Park. A.M. further stated that Seventh Street was essentially the alley that ran behind Cummings' house. Those details were included in the information Officer Nordell passed along to Detective Gillan and were supplemented by A.M.'s statement to Gillan that Cummings lived on 8th Street "near the Golden Q." That collective description then proved useful when Detective Gillan ran the name "Brian Cummings" that A.M. provided, through the police department's database and obtained a precise address on 8th Street for an individual by that name. When the detective cross-referenced that address with the geographical description A.M. provided, it became apparent that the "Brian Cummings" with whom A.M. said he engaged in illicit drug transactions was

likely the person of the same name who resided at the address on 8th street, thereby ultimately pinpointing an actual address for Cummings.

Detective Gillan's decision to simply state that A.M. provided an address for Cummings, as opposed to the lengthier detail—A.M. offered geographical reference points during his interview with law enforcement which, when cross-referenced with other information, subsequently revealed a particular address for Cummings—is not indicative of an intent on the part of Detective Gillan to deceive or mislead the district court. Rather, it is best characterized as streamlining a point of information obtained during their investigation in which A.M. played a critical role. We are not persuaded that had Detective Gillan instead opted to provide the issuing magistrate with the encyclopedic account of how Cummings' home address was determined that it would have resulted in a distinctly different probable cause determination.

We next turn our attention to Cummings' challenge to the omission of the fact that A.M. lacked knowledge of certain personal details relative to Cummings. In particular, A.M.'s ignorance of the number of roommates Cummings had, what type of vehicle Cummings drove, and whether "Brian Cummings" was truly his legal name or simply an alias. Through the inclusion of these factors, Cummings seemingly attempts to cast the nature of his relationship with A.M. in a distinctly different light than what is conveyed by the record before us. There is not any point in the record, or evidence contained therein, that demonstrates the relationship between 16-year-old A.M. and 23-year-old Cummings could be characterized as anything other than a dealer and his customer. That is, they did not share a friendship or regularly socialize with one another. Cummings fails to explain how it is, given the limited scope of the interactions between the two, that A.M. would be privy to any of the details Cummings highlights within this factor. Cummings further highlights the fact that A.M. was unable to affirmatively state whether the person depicted in a photo taken from Cummings' social media account was the man he knows to be Brian Cummings. However, we know nothing of the photograph

24

displayed to A.M. and it is not included in the record for our assessment. We do not know whether the photo truly depicted Cummings, or possibly showed him at a younger age, or with different hair or facial hair than A.M. knew him to have. We are left simply with A.M.'s recorded interview in which he unequivocally stated that he had "never seen [Cummings] like that" in response to a photo that neither party has demonstrated actually depicts Cummings.

Finally, and perhaps more importantly, Cummings neglects to provide us with any compelling argument as to how such factors would either heighten or minimize A.M.'s credibility in the eyes of the reviewing magistrate with respect to Cummings' drug distribution practices. The interview of A.M. included a considerable amount of discussion, and it is not practical to include the entirety of the information in the affidavit for a search warrant. While A.M. did not know Cummings' exact street address, he described the house and location with more than sufficient detail to enable law enforcement officers to locate the address. Had the affidavit said that A.M. did not know the exact address but then included the description A.M. provided for the house, the magistrate would have been left with a long description for the same result. The omissions to which Cummings objects fail to demonstrate that the detective intentionally omitted them to secure a search warrant. Accordingly, while the detective may have made a conscious decision not to include the details highlighted by Cummings under this point, there is no indication that the decision was fueled by the nefarious purpose of misleading the issuing magistrate as would be required to undermine the applicability of the good-faith exception. We also decline to find that the magistrate's awareness of this issue would have yielded a different probable cause finding.

It is without question that a portion of the information acquired by law enforcement officers as a product of their investigation was not ultimately included in the affidavit. Detective Gillan acknowledged as much during his testimony. In highlighting these factors, Cummings seems to confuse the deliberate exclusion of factors the officer

deems irrelevant for purposes of the warrant, with the deliberate omission of information for an unlawful purpose. As the district court found, these omissions were not designed to mislead the magistrate. And none of them were material. Both components of which must be present to obtain relief under this claim. Without making adverse credibility findings about the testimony of one or both officers, there certainly is not sufficient evidence in the record to conclude that Detective Gillan crafted his affidavit in such a way as to deliberately mislead the magistrate. It is not our job to make credibility determinations after a contested evidentiary hearing. We are an appellate court. In reviewing a district court's decision on a motion to suppress, we do not reweigh evidence or assess the credibility of the witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

Cummings encourages us to view this case as analogous to *Landis* and arrive at the same conclusion, but we take a distinctly different view of the two cases. The informant in *Landis*, Melroy, told the police several different stories about where she obtained her marijuana. Once she decided on a final version of events, law enforcement officers relied on that version alone and used it as their exclusive source of information when drafting an affidavit for a search warrant for Landis' home. 37 Kan. App. 2d at 418-19. Landis filed a motion to suppress to challenge the affiant's exclusion of Melroy's conflicting statements about her source for marijuana from the search warrant affidavit. The district court found that the detective deliberately omitted information but that it was not material as it did not undermine probable cause for issuance of the warrant. 37 Kan. App. 2d at 413.

On appeal, a panel of this court conducted an extensive analysis of Landis' case and concluded that the information set forth in the affidavit fell short of what was required to establish that Melroy was a reliable source of information. 37 Kan. App. 2d at 420. Specifically, our court highlighted the absence of any indication that law enforcement officers had established a relationship with Melroy where she previously provided reliable information, so there was no information which shed light on the

26

officers' rationale for labeling Melroy a credible source. The panel additionally noted there was no information from which it could conclude that the officers made any attempt to independently investigate Landis' involvement in drugs and the only information in the affidavit tending to indicate drugs might be found at Landis' residence came from Melroy's statement that she purchased drugs there earlier that day. Finally, the panel observed there was no indication the officers observed any activities at Landis' residence which would confirm Melroy's statements. Overall, the only independent police investigation conducted in Landis' case was the verification of the location of his residence. 37 Kan. App. 2d at 420.

We do not share Cummings' view that his case is so analogous to *Landis* as to require reversal. Contrary to the officers in *Landis* who failed to demonstrate they had previous encounters with their informant that resulted in reliable information, in this matter Officer Nordell specifically testified that in his prior dealings with A.M. the young man was "helpful or honest." A.M. was known to law enforcement officers, which adds to his credibility. Additionally, the affidavit here reflects several significant drug purchases A.M. made from Cummings, each time at Cummings' residence, within the same week A.M. had contact with law enforcement officers. A.M. was also able to share information he obtained by virtue of being inside Cummings' residence, aside from those three sales, that detailed the way Cummings packaged his supply, the distinguishing feature his fentanyl-laced product bore, and the large amount of various drugs he had on hand. Also, when stopped, A.M. had evidence in his car of significant drug involvement, including 109 Xanax pills he purchased from Cummings that evening, a quantity of narcotics that was not present in *Landis*, which demonstrates that A.M. likely has some knowledge or familiarity with the drug trade. Additionally, unlike *Landis*, A.M. did not mislead law enforcement officers about where he obtained the drugs. While he obfuscated and vacillated between telling officers he did not know the identity of his dealer or naming his source as Cummings, he did not provide definitively different locations for his purchases like the informant in *Landis* that would serve to undermine his

27

credibility. Finally, the detective utilized the law enforcement database to verify that the residence A.M. described was truly occupied by Cummings. Accordingly, the information available in the affidavit here surpasses what was found to be deficient in *Landis*.

Another relevant case in this contextual sphere is *Adams*. In that case, as in Cummings', the court was faced with a named informant who was also a participant in the crime and who made statements in the hope of obtaining leniency, but the *Adams* court arrived at a different conclusion than the *Landis* panel. 294 Kan. at 181-82. The informant in *Adams* was arrested during a traffic stop when an officer determined she was intoxicated. Based on her statements that she purchased materials to make methamphetamine and that those items were at her home, the officers obtained a search warrant for her residence. Adams lived with the informant and was ultimately arrested during the execution of the warrant and charged with methamphetamine-related offenses. 294 Kan. at 173-75.

The *Adams* court distinguished *Landis* noting that in the latter case, the *Landis* informant "merely point[ed] a finger in the direction of a tenuous third party." By contrast, the informant in *Adams* "[led] the officers to evidence that had the potential of fortifying or adding to charges the State could bring against her." 294 Kan. at 182; see also *State v. Howell*, No. 109,805, 2013 WL 6168474, at *4 (Kan. App. 2013) (unpublished opinion) (citing *Adams* to find that a named informant who voluntarily gave information that potentially implicated his wife was reliable because he was not "pointing a finger at a tenuous third party").

The final case which bears mentioning is *State v. Wasylk*, No. 112,128, 2015 WL 6833835 (Kan. App. 2015) (unpublished opinion). The *Wasylk* panel determined that the facts and circumstances of its case landed somewhere between *Landis* and *Adams*. Where the informant in *Adams* provided information which directed law enforcement officers to her own home and further implicated her in criminal activity, the *Wasylk* informant,

28

Hernandez-Corea, gave officers information that further implicated her in criminal activity, but directed the officers to someone else's (Wasylk's) property. Hernandez-Corea's statements were also more detailed than the information provided by the *Landis* informant. *Wasylk*, 2015 WL 6833835, at *9. Specifically, she informed law enforcement officers that Gohring was selling methamphetamine from her Emporia apartment and described a sale conducted earlier in the day. Hernandez-Corea also described a rural property north of Emporia where Gohring was manufacturing methamphetamine and provided the officers with a detailed description for how to locate it; one officer familiar with the area recognized the description. That officer inquired whether it was the "'Dave Wasylk farm,'" and Henandez-Corea confirmed that it was. 2015 WL 6833835, at *2. She also accurately described the buildings located on the Wasylk farm, including the two-story white farmhouse with a trailer behind it. Hernandez-Corea told officers that she went out to the farm with Gohring on several occasions since mid-July 2013 while he was manufacturing methamphetamine in a trailer. She said that Gohring took her food processor out to the farm to grind up pills and Gohring also told her that he had stolen anhydrous ammonia and was keeping it in a cooler at the farm. Hernandez-Corea told the officers that Gohring went out to the farm around 1:30 or 2 in the morning on August 13 and returned around 9:30 that morning with the methamphetamine that he sold to Criqui later that day. 2015 WL 6833835, at *2.

The *Wasylk* court concluded that while Hernandez-Corea was not the ideal informant, her identity was known to officers which enabled her to be viewed as "more reliable than someone making an anonymous tip." 2015 WL 6833835, at *9 (citing *Powell*, 299 Kan. at 702). The court acknowledged that her motives included hope for leniency, but clarified that such motives merely undercut her credibility, they did not destroy it. *Wasylk*, 2015 WL 6833835, at *9 (citing *Hensley*, 298 Kan. at 432) ("An informant's unexpressed, questionable motives do not necessarily prohibit reliance on information that informant supplies."). Finally, the *Wasylk* court highlighted the fact that unlike the affidavit in *Landis*, the affidavit before it did not contain any deliberate

29

omissions, nor did it suffer from any "glaring deficiencies" such as what items officers sought to seize. *Wasylk*, 2015 WL 6833835, at *9 (citing *Powell*, 299 Kan. at 702); *Landis*, 37 Kan. App. 2d at 423 (officer deliberately omitted the informant's multiple changes to her story); and *Hendricks*, 31 Kan. App. 2d at 145 (declining to apply the good-faith exception because of officer's deliberate omission of details concerning informant's veracity).

We find that like *Wasylk*, Cummings' case also lands at a point between *Landis* and *Adams*. A.M. was also a named informant which cloaked him with a marginally heightened degree of reliability at the outset. *Powell*, 299 Kan. at 702-04. He was also a known individual who had provided officers with honest information in the past which heightened his reliability. To the extent he shared information with the express hope of obtaining leniency, again, that merely casts a shadow on his credibility, it does not prohibit reliance on the detailed information he provided. Finally, as noted above in our analysis of each omission alleged by Cummings, unlike *Landis*, this case was not plagued by deliberate material omissions from the affidavit.

In rejecting Cummings' assertion that the good-faith exception was not available as a safety net to uphold the search of his residence, the district court declined to find that the points highlighted by Cummings necessarily adversely affected A.M.'s credibility and created a situation where the omissions misled the judge into signing off on the search warrant. We share in its assessment that none of the omissions highlighted by Cummings, viewed either independently or collectively, would reasonably cause a reviewing magistrate to question A.M.'s reliability or veracity.

The process of preparing a warrant affidavit requires affiants to exercise discretion by selecting certain facts for inclusion. *United States v. Tate*, 524 F.3d 449, 454-55 (4th Cir. 2008). "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d

297, 300 (4th Cir. 1990). As explained in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), the information offered in support of a search warrant should not be viewed in isolation but instead should be evaluated based on the totality of the circumstances. As a result, "even if [there is] some doubt as to an informant's motives, his [or her] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [the] tip to greater weight than might otherwise be the case." 462 U.S. at 234. Furthermore, "an excessively technical dissection of informant's tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate" is discouraged. 462 U.S. at 234-35.

Following a thorough and extensive review of Cummings' claim we find he has failed to make a credible showing that Detective Gillan deliberately omitted material information from the affidavit and thereby hoodwinked the magistrate judge into issuing a search warrant for Cummings' residence.

> 2. *The district court properly concluded that the warrant was not so lacking in indicia of probable cause as to render a law enforcement officer's belief in its existence entirely unreasonable.*

We now shift our focus to the other factor Cummings relies on in his pursuit of relief, the third exception articulated in *Leon*—that the warrant is so lacking in indicia of probable cause as to render the law enforcement officer's belief in its existence entirely unreasonable. See *Hoeck*, 284 Kan. at 464. In some measure, Cummings' arguments to the district court, and again to this court, with respect to this factor are intertwined with his preceding contention that Detective Gillan's affidavit was deficient due to the absence of information concerning A.M.'s credibility. A corresponding deficiency, his argument goes, is that a reasonable law enforcement officer would not rely on an affidavit that lacked such corroborating information.

When ascertaining whether an officer's reliance on a warrant was reasonable, our obligation is to determine "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Powell*, 299 Kan. at 701 (quoting *Leon*, 468 U.S. at 922 n.23). This standard, while objective, defers to the police officers acting under a search warrant. *Althaus*, 49 Kan. App. 2d at 217, 222, 225. "The threshold to avoid the *Leon* good-faith exception is a high one." *Powell*, 299 Kan. at 701. The question is not whether the magistrate judge was wrong in believing there was probable cause to grant the warrant. Rather, it is whether that determination was "'so obviously'" wrong that "'any reasonable officer would have recognized the error.'" *Powell*, 299 Kan. at 699 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 132 S. Ct. 1235, 182 L. Ed. 2d 47 [2012]); see *Althaus*, 49 Kan. App. 2d at 225. To resolve the issue, we review the affidavit as a whole. *Powell*, 299 Kan. at 701. Because the specific issue is whether the affidavit contained so little indication of probable cause that it was unreasonable for the officers to believe the warrant was valid, we must remain mindful of the threshold for probable cause: specific facts that lead a reasonable person to conclude that evidence of a crime may be found in a particular place. *Althaus*, 49 Kan. App. 2d at 223.

As a starting point, we acknowledge that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965). If we "desire to encourage use of the warrant process by police officers, the worst course of action would be to pick apart warrant affidavits from the pristine perch of hindsight or to penalize officers for securing what the law requires." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011). Obtaining a residential search involves a process overseen by a neutral magistrate who makes an independent judgment about the sufficiency of the warrant affidavit. They are free to reject warrant applications that provide scant or insufficient evidence.

Warrants and their supporting affidavits are to be interpreted in a common sense, rather than hyper-technical, fashion. *State v. Ames*, 222 Kan. 88, 92, 563 P.2d 1034 (1977). Probable cause exists when the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched. *State v. Coe*, 223 Kan. 153, Syl. ¶ 4, 574 P.2d 929 (1977). An affidavit is not devoid of factual support "if it 'establishe[s] a minimally sufficient nexus between the illegal activity and the place to be searched.'" *United States v. Henderson*, 595 F.3d 1198, 1202 (10th Cir. 2010). A sufficient nexus is established when it describes circumstances which would warrant a person of reasonable caution to believe that the items sought are in a particular place. *State v. Hill*, 281 Kan. 136, 146, 130 P.3d 1 (2006).

The district court subjected Cummings' claim to an evidentiary hearing, conducted an extensive analysis, and concluded that a fair review of the totality of the circumstances outlined in the affidavit provided adequate indicia of probable cause. It specifically noted that the circumstances surrounding A.M.'s arrest, as well as the drugs seized from his vehicle and the detailed information he provided about his interactions with Cummings, left law enforcement officers without any reason to question the validity of the warrant. An additional component in the district court's calculus was the fact that the certifying judge's legal career spanned four decades, with nine of those years as a district court judge, as well as serving as the appointed chief judge at the time the affidavit was reviewed. In the district court's view, a career of that caliber undermined any assertion that a well-trained, objective officer would question the validity of the judge's probable cause determination. Cummings does not take issue with that portion of the court's ruling, choosing instead to focus on whether a law enforcement officer can reasonably rely on a warrant that contains "an uncorroborated tip from an informant of unknown reliability."

When we consider whether the officer relied in good faith upon a warrant, we must look at the underlying documents to see whether they are devoid of factual support, not merely whether the facts they contain are legally sufficient. An affidavit devoid of

33

factual support is "one that merely states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Chambers*, 882 F.3d 1305, 1310-11 (10th Cir. 2018). Importantly, the affidavit at issue need not be a paragon of specificity to garner good-faith reliance. 882 F.3d at 1311.

In *Zwickl*, our Supreme Court advised that search warrant affidavits should be viewed along a continuum:

> "'At one end are affidavits that "provide the magistrate with a *substantial basis for determining the existence of probable cause*." In those cases, there is a valid warrant. At the other end of the continuum are the so-called "bare bones" affidavits, those affidavits so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. This is [one] circumstance where an officer's reliance would be objectively unreasonable and suppression would be appropriate. In the analytical space between the ends of the continuum are those cases where the warrant is ultimately found to be unsupported by an affidavit containing a substantial basis for the determination of probable cause, but where officers executed the warrant in objective good faith. It is in this analytical space between the extremes on the continuum that the good faith exception applies. In those cases where the good faith exception applies, the affidavits do not provide a substantial basis for the determination of probable cause but do provide some indicia of probable cause that is sufficient to render official reliance reasonable.' [Citations omitted.]" 306 Kan. at 294-95.

As we consider how a reasonable, well-trained officer might respond when confronted with the warrant we have been asked to scrutinize, we reiterate that our sufficiency analysis is confined to the four corners of the document. *State v. Hachmeister*, 306 Kan. 630, 638, 395 P.3d 833 (2017). Accordingly, we reviewed each of the 24 paragraphs set out in the warrant in their entirety and find the warrant falls well within the middle of the *Zwickl* continuum. It is not a bare bones warrant hindered by mere

suspicions, nor is it comprised of mere conclusory statements wholly devoid of any underlying factual support to demonstrate reliability.

For good faith to exist, there must be some factual basis connecting the place to be searched to the defendant or to the suspected criminal activity. It is when this connection is wholly absent that an affidavit and its corresponding warrant are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Exclusion is appropriate in such circumstances because "reasonably well-trained" officers, exercising their own professional judgment, will be able to recognize the deficiency. *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005).

When working within the *Leon* framework, the affidavit must establish only a "'minimal nexus between the place to be searched and the suspected criminal activity.'" *Zwickl*, 306 Kan. at 295. "If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'—'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable. [*United States v.*] *Laughton*, 409 F.3d [744, ]749-50 [(6th Cir. 2005)]." *United States v. Ward*, 967 F.3d 550, 559 (6th Cir. 2020) (Griffin, J., dissenting).

We have conducted a thorough review of the affidavit at issue and are satisfied it meets the required minimal nexus standard. To be sure, a fair reading of its content undeniably reveals *some* connection between Cummings' home and illegal narcotics. Again, the affidavit stated, in relevant part:

- At the time of the traffic stop, A.M. was in possession of, among other things, 109 Xanax pills, 2 clear pill capsules with a white residue, and $507 in U.S. currency. A field test conducted on the white residue yielded a presumptively

positive result for MDMA/Ecstasy which is also commonly referred to as "Molly."

- A.M. told Officer Nordell that he frequently purchases Xanax, Molly, and marijuana from Cummings at a residence located in Hays, Ellis County. He scheduled purchases with Cummings either by cell phone or the Snapchat app, and upon arrival at Cummings' residence Cummings either brought the drugs out to A.M. at his car or the transaction was completed inside Cummings' residence.

- A.M. shared that he was inside Cummings' residence two weeks prior to the stop and observed 2 to 2.5 pounds of marijuana and Cummings remarked he needed to re-up his supply. On other occasions, A.M. had seen pounds of Xanax pills and Xanax pills laced with fentanyl inside Cummings' residence. Cummings told him that the latter variety bears a distinctive "M-30" imprint. A.M. told Officer Nordell that Cummings packaged both types of pills in vacuum-sealed bags, similar to 2-gallon freezer bags.

- A.M. disclosed that one week prior to the traffic stop he purchased 50 Molly capsules from Cummings for $300. He further divulged that on the night before and the night of the stop he purchased 40 Xanax pills, and paid $40 each time, for a total of 80 pills.

- In both interviews, A.M. admitted that on the night of the traffic stop he and his friends pooled approximately $400 together for the purpose of purchasing illegal drugs from Cummings; the Xanax pills recovered from his car reflected a portion of their purchase.

- Detective Gillan conducted a records check and verified that Cummings lived at the residence where A.M. alleged the illegal drug transactions occurred.

The affidavit makes clear that A.M. had a strong basis for the detailed knowledge he shared with law enforcement. He recounted multiple transactions with Cummings at Cummings' residence over a relatively short period of time and very close in time to his encounter with law enforcement. A.M. offered extensive information concerning the illegal drugs Cummings sold, including his various offerings, the prices he charged, his packaging methods, and the fact he distributed fentanyl-laced Xanax pills that bore a distinctive imprint. In *State v. Morgan*, our Supreme Court observed that while evidence of a single isolated drug sale may not establish probable cause to believe drugs can be found at a particular location, "where an affidavit gives evidence of activity indicating protracted or continuous conduct at a particular location and that evidence provides a reasonable basis to infer drugs are still present, probable cause may exist." 222 Kan. 149, 153, 563 P.2d 1056 (1977); see also *State v. Jacques*, 225 Kan. 38, 42, 587 P.2d 861 (1978) ("A protracted or continuous course of drug traffic at a particular location unquestionably would support the determination of probable cause.").

Cummings contends that such a conclusion cannot be reached here given the absence of information from the affidavit that demonstrates his reliability and the veracity of the information he provided. But as we extensively articulated in the preceding issue, we reject Cummings' claim that the omitted information was material to the probable cause determination.

The *Leon* Court explained how it is only the marginal cases, the doubtful cases, and those where reasonable minds may differ on the existence of probable cause that are truly called into question. 468 U.S. at 914, 921-22. That is, minus rare and unusual circumstances, law enforcement officers generally "cannot be expected to question the magistrate's probable-cause determination or [their] judgment that the form of the warrant

37

is technically sufficient." 468 U.S. at 921. "As with any remedial device, the [exclusionary] rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. [Citations omitted.]" *Arizona v. Evans*, 514 U.S. 1, 11, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995). We are not persuaded that Cummings' case can properly be counted among the marginal and doubtful cases in which law enforcement would question the existence of probable cause contemplated by *Leon*.

To reiterate, avoiding application of *Leon*'s good-faith exception demands that Cummings clear a high threshold. *Powell*, 299 Kan. at 701. An evaluation of the totality of the circumstances reveals that feat has not been accomplished here. We agree with the district court that the warrant was not so lacking in indicia of probable cause as to render a law enforcement officer's belief in its existence entirely unreasonable.

CONCLUSION

Cummings brought this case to challenge the district court's denial of his motion to suppress evidence seized from his home following the execution of a warrant. More specifically, he challenges the district court's denial of his claim that the first and third exceptions to *Leon*—that the magistrate issuing the warrant was deliberately misled by false information and there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid—prohibit application of the good-faith exception to his case.

We likewise decline to adopt his position. As the affiant, Detective Gillan made no material omissions from his affidavit that were deliberately designed to mislead the issuing magistrate. Additionally, when we consider the totality of the circumstances, we find that a law enforcement officer could reasonably rely, in good faith, upon the search

warrant issued for Cummings' home. Finding no error in the district court's application of the good-faith exception, we affirm its denial of Cummings' motion to suppress.

Affirmed.